Rockingham
No. 83-172

PMC REALTY TRUST

AND

BERGE NALBANIAN

v.

TOWN OF DERRY

July 2, 1984

*Fryer, Boutin, Warhall & Solomon P.A.*, of Londonderry (*Edmund J. Boutin* on the brief and orally), for the plaintiffs.

*Soule, Leslie, Bronstein & Zelin*, of Salem (*Barbara F. Loughman* on the brief and orally), for the defendant.

BROCK, J. PMC Realty Trust owns a 54-acre parcel of land in Derry. Berge Nalbanian holds an option to purchase the property. They appeal from the recommendation of a Master (*Francis J. Frasier*, Esq.), approved by the Superior Court (*Nadeau*, J.), upholding the refusal of the Derry Zoning Board of Adjustment (the board) to grant two zoning variances that would have permitted the plaintiffs to construct 308 units of multiple-family housing on the PMC property.

At oral argument, the parties stipulated that one of the two requested variances, involving water and sewer connections, is no longer necessary because practical difficulties that had prevented compliance with the zoning ordinance have been resolved since trial. Thus, the only question before us on this appeal is whether the master erred, either (1) in finding that a 1982 amendment to the Derry Zoning Ordinance operated to prohibit construction of multiple-family housing on the PMC property, or (2) in upholding the board's refusal to grant a variance from the amended ordinance in this case. Because we conclude that the 1982 amendment may not have been

applicable to the PMC property, we reverse and remand for further proceedings.

The land in question is bounded on one side by land zoned for industrial use, on one side by a high-tension power line, and on the remaining two sides by land zoned for residential use. Prior to 1976, it was zoned for industrial use only. In 1976, the then owner, Angelo Cataldo, applied to the board for a variance with the asserted purpose, as testified to by a board member, of constructing multiple-family housing on the property. Cataldo argued that the land, which is dominated by a sizable hill, was both too sloping and too elevated to permit profitable industrial use. After the board denied the variance and Cataldo appealed the decision, the Superior Court (*Mullavey*, J.) approved a consent decree in settlement of the case.

The consent decree stated that a hardship existed with respect to the property, which prevented its use for industrial purposes. The next sentence reads: "In view of this, it is decreed that such land be used for those uses permitted for land situated in the General Residence Zone as defined in Section 1.410 of the Derry Zoning Ordinance." Two months after the date of the consent decree, Cataldo conveyed to the town approximately one and one-half acres of land at the summit of the hill on the property, for the purpose of constructing a two-million-gallon water tank. The parties in the instant case agree that "a deal was worked out where the residential use of the PMC parcel was exchanged for the Quitclaim Deed permitting the Town to erect the water tank."

It was assumed at trial that in 1976 the consent decree would have permitted Cataldo to build multiple-family housing on the property. It appears that the only reasons he failed to do so were practical ones; namely, temporary limitations on the town's water and sewer capacity. Those same limitations forced PMC, which purchased the land in 1980, and Nalbanian to apply for the water and sewer variance mentioned above, which has since become unnecessary. The town concedes that, if the 1976 zoning ordinance had remained unchanged, PMC or Nalbanian could build multiple-family housing on the property now without any need for a variance.

The zoning ordinance, however, was amended by the voters of Derry in November of 1982. The amendment prohibited construction of new multiple-family housing in all but three specified areas of the town, none of which encompasses the PMC property.

The town argues, and the master found, that the 1976 consent decree did not create any "vested right" in Cataldo and his successors in interest that would prevent application of the 1982 amendment to the PMC property. We agree that no right was created of the type involved in this court's earlier cases. *See, e.g., Henry and*

*Murphy, Inc. v. Town of Allenstown*, 120 N.H. 910, 912–13, 424 A.2d 1132, 1133–34 (1980); *Gosselin v. Nashua*, 114 N.H. 447, 450–51, 321 A.2d 593, 596 (1974).

 Those cases rested on the common-law rule that "an owner, who, relying in good faith on the absence of any regulation which would prohibit his proposed project, has made substantial construction on the property or has incurred substantial liabilities relating directly thereto, or both, acquires a vested right to complete his project in spite of the subsequent adoption of an ordinance prohibiting the same." *Piper v. Meredith*, 110 N.H. 291, 299, 266 A.2d 103, 109 (1970). Because neither Cataldo nor PMC had incurred substantial construction expenses, or other liabilities directly related to construction, the master properly ruled that they had not acquired vested rights under the *Piper* rule.

There remains, however, a dispute as to whether the 1976 consent decree, because it was associated with Cataldo's conveyance to the town of the land for the water tank, gave Cataldo and his successors in interest a *contractual* vested right to build multiple-family housing regardless of any later amendment to the zoning ordinance. There is some authority to the effect that such contractual rights may be created. *City of Baltimore v. Crane*, 277 Md. 198, 206–07, 352 A.2d 786, 790–91 (1976). Accordingly, we must determine the nature of the 1976 settlement agreement between Cataldo and the town.

 The parties agree that Cataldo obtained a variance as a result of the consent decree. But it is unclear whether: (1) Cataldo conveyed the land for the water tank in exchange for the variance alone; (2) he conveyed the land in exchange for the variance *plus* a contractual vested right to build multiple-family housing; or (3) he obtained the variance as a matter of right under the statutes, but conveyed the land in exchange for an additional contractual vested right to build multiple-family housing. A variance by itself does not create such a vested right. *Navin v. Exeter*, 115 N.H. 248, 251–52, 339 A.2d 12, 15 (1975); *Dimitrov v. Carlson*, 138 N.J. Super. 52, 58–59, 350 A.2d 246, 250 (1975).

 We need not choose among these possibilities, however, because under all three interpretations the agreement through which the town obtained Cataldo's land was illegal and void. A town may exercise its zoning authority only in accordance with applicable statutes. *Buxton v. Town of Exeter*, 117 N.H. 27, 29, 369 A.2d 188, 189 (1977); RSA ch. 31 (repealed by Laws 1983, 447:5, I, and replaced by RSA chs. 672–677, eff. Jan. 1, 1984). The town may not

bargain away this delegated authority, even under the form of a consent judgment. *Midtown Properties, Inc. v. Madison Tp.*, 68 N.J. Super. 197, 206–10, 172 A.2d 40, 45–47 (1961) (citing *V. F. Zahodiakin, &c., Corp. v. Bd. of Adjustment, Summit*, 8 N.J. 386, 86 A.2d 127 (1952)), *aff'd*, 78 N.J. Super. 471, 189 A.2d 226 (1963).

> "While a municipality possesses the inherent right to compromise a claim against it, it may not, under the guise of a compromise, impair a public duty owed by it or give validity to a void claim . . . . Municipal corporations have no power to make contracts which will embarrass or control them in the performance of their legislative powers and duties."

*Andgar Associates, Inc. v. Board of Zoning Appeals*, 30 A.D.2d 672, 674, 291 N.Y.S.2d 991, 995 (1968); *see Cederberg v. City of Rockford*, 8 Ill. App. 3d 984, 986–87, 291 N.E.2d 249, 251–52 (1972); *State ex rel. Zupancic v. Schimenz*, 46 Wis. 2d 22, 28, 174 N.W.2d 533, 537 (1970). Thus, the town had no authority to give Cataldo either a variance or any form of immunity from future zoning changes in exchange for the land for the water tank. "Where a municipal governing body enters into a contract which is beyond the scope of the municipality's powers, such an attempt to contract is termed *ultra vires*, and the contract is wholly void." *Marrone v. Town of Hampton*, 123 N.H. 729, 735, 466 A.2d 907, 910 (1983).

■ This is not a case where a zoning board found it necessary to attach a condition to the grant of a variance "in order to observe the spirit of the zoning ordinance." *Vlahos Realty Co. v. Little Boar's Head District*, 101 N.H. 460, 463, 146 A.2d 257, 260 (1958). Nor is this a case like *Crane*, where the plaintiffs obtained vested rights through an ordinance granting the same benefit "to all similarly situated property owners . . . ." *City of Baltimore v. Crane*, 277 Md. at 206, 352 A.2d at 790. Rather, the agreement here was "an attempt to do by contract what can only be done by following statutory procedure." *Midtown Properties, Inc. v. Madison Tp.*, 68 N.J. Super. at 206, 172 A.2d at 45.

■ It is still possible, of course, that the variance Cataldo obtained in 1976 was justified under the five-part test which evolved from the provisions of the former RSA 31:72, III (since repealed and recodified as RSA 674:33, I(b) (Supp. 1983), eff. Jan. 1, 1984), and which we restated recently in *Governor's Island Club v. Town of Gilford*, 124 N.H. 126, 129, 467 A.2d 246, 247 (1983). Indeed, the statement in the consent decree that the property "cannot be used for the industrial purposes for which it is zoned" may imply a finding by

the court that the five-part test was met. The validity of the variance is a matter for the trial court to determine on remand.

██ ██ If the variance was validly granted, Cataldo's and his successors' rights under that variance may well have survived the 1982 zoning amendment, even though no *contractual* vested rights were involved. It is well settled that "a bad faith or discriminatory enactment of a zoning ordinance for the purpose of preventing a legal use by an applicant [for a building permit] may confer vested rights on the applicant." *Thomas v. Zoning Bd. of Appeals, Etc.*, 381 A.2d 643, 647 (Me. 1978) (citing *Commercial Properties, Inc. v. Peternel*, 418 Pa. 304, 211 A.2d 514 (1965)). "Similarly a court may deny an agency the benefit of a change in the law when it has intentionally or even negligently delayed action on an application for a permit or license until after the law had been amended to authorize denial of the application." *Faymor v. Bd. of Stds. & Apps.*, 45 N.Y.2d 560, 565, 383 N.E.2d 100, 102, 410 N.Y.S.2d 798, 800 (1978); *see also State ex rel. Humble Oil & Ref. Co. v. Wahner*, 25 Wis. 2d 1, 12–15, 130 N.W.2d 304, 310–12 (1964).

The record before us is strongly suggestive of bad faith on the town's part in its dealings with Cataldo, PMC and Nalbanian. In addition to obtaining Cataldo's land pursuant to the illegal agreement discussed above, and building a water tank thereon, the town failed for at least seven years to screen the tank with trees, which it had agreed to do as a condition of the deed conveying the land. The master found that this significantly reduced the property's value. Both the town and Cataldo appear to have understood, in 1976, that Cataldo's proposed construction of multiple-family housing might be delayed by the problems with water and sewer capacity mentioned above; yet the town sought to prohibit construction of multiple-family housing on the property (now owned by PMC) just a few months before those problems were finally resolved.

██ It is unclear on this record by what procedure the 1982 amendment was placed on the ballot; nor did the master consider whether the town's actions during its protracted negotiations and litigation with Cataldo, PMC and Nalbanian were so unreasonably delaying as to indicate bad faith. On remand, the trial court should consider all aspects of the town's behavior, in the light of this opinion, and determine whether bad faith was involved, either in the enactment of the 1982 zoning amendment, or in the negotiations and litigation which prevented construction of multiple-family housing on the PMC property before that year. If bad faith was involved, then the plaintiffs cannot be deemed to have lost any rights that they would have been able to exercise in the absence of bad faith.

The case is remanded to the superior court for further proceedings in conformance with this opinion.

*Reversed and remanded.*

All concurred.