Merrimack
No. 83-120

ARTHUR SINCLAIR

v.

TOWN OF BOW

August 10, 1984

*Tardif, Shapiro & Cassidy*, of Concord (*R. Peter Shapiro* on the brief and orally), for the plaintiff.

*Upton, Sanders & Smith*, of Concord (*Russell F. Hilliard* on the brief and orally), for the defendant.

BROCK, J. The plaintiff, Arthur Sinclair, brought an action for breach of contract against the defendant, the Town of Bow (town). He alleged that the town failed to carry out an agreement, entered into by the administrative assistant to the town's board of selectmen, for the sale to the plaintiff of 386 silver commemorative coins.

After a trial in Superior Court (*Cann*, J.), the jury awarded the plaintiff damages. The town appealed, on the stated ground that the trial court should have granted the town's motion for a directed verdict. The town argues that the evidence presented at trial could not support a finding that the administrative assistant had authority to enter into a binding contract for the sale of the coins in question. We reverse.

In 1975, the plaintiff was appointed to a committee planning the observance of the town's 250th anniversary, which was to take place in 1977. The plaintiff is a coin collector, and he proposed that the town authorize the minting of coins (actually medallions, since they are not legal tender) to commemorate both the town's anniversary and the bicentennial of the American Revolution.

The coins were minted and sold throughout 1976 and 1977 under the plaintiff's direct supervision. He arranged for the printing of articles in two newspapers, announcing that pewter, bronze, silver

and gold-plated coins were available, and that orders should be sent directly to him.

The articles also announced "a limit of two per order" on the sale of silver coins. The plaintiff testified that he set this limit because he believed that the coins would be in great demand, and he wished to prevent the "possibility of a lot of people in town not being able to buy one, because somebody else could come in and hoard the market, so to speak." The silver coins were priced at $15 each.

In fact, the coins sold poorly. The plaintiff continued to sell the coins from his house, and on occasion sold as many as five silver coins to one person. In December 1977, the plaintiff accounted to the town for the coins sold up to that time, and turned over all the unsold coins. Throughout the next two years, the town's selectmen considered several proposals for disposing of the coins, but refused to sell them for less than their original list prices.

The coins were still offered for sale at the town offices. The town advertised the sale through a sign in the offices, as well as in the town's annual report. Neither of these notices contained any mention of a per-order limit on silver coins. The uncontradicted evidence indicated that in practice, however, all requests for bulk sales were referred to the selectmen.

In early 1979, the director of a non-profit organization requested the town's assurance that it would sell him coins at the original price, as long as the supply lasted, for resale through his organization. The administrative assistant referred this request to the selectmen. They agreed to sell the coins at the original prices, with no mention of a limit, but stated: "We would want to reserve the right to sell some of the medallions to local people if they ask for them at the same price." It is not clear how many coins the organization actually purchased.

Toward the end of 1979, the price of silver bullion began to increase substantially. By January 14, 1980, it had risen to more than $40 per troy ounce. The plaintiff was aware of this, and he also knew that each silver commemorative coin contained nearly a full troy ounce of pure silver.

On January 14, 1980, the plaintiff went to the town offices carrying $2,000 in cash. Because the secretary who normally handled coin sales was absent due to illness, the plaintiff dealt only with the administrative assistant, Walter Jones.

The plaintiff offered to buy the remaining silver coins for the listed price of $15 each, and asked how many were left. Mr. Jones said that he could not be certain, but that his records indicated 386 silver coins remaining. The plaintiff again offered to buy all the

coins, paying $2,000 immediately and the balance on receipt of the coins.

There was conflicting evidence regarding the rest of the conversation. The plaintiff testified to this effect. Mr. Jones said he could not give the plaintiff any coins that day because they were in a safe to which he did not have access. Mr. Jones then wrote out a "bill of sale" acknowledging receipt of $2,000 from the plaintiff as a "deposit" toward the purchase of 386 silver coins, and adding: "Balance of $3,790 payable on delivery of coins." At this point, Mr. Jones telephoned the chairman of the board of selectmen and told him that he had a buyer for the silver coins at $15 each. After the call was completed, the plaintiff left the office.

Mr. Jones testified to the following effect. He could not recall telling the plaintiff that the coins were in a safe; in fact, they were in a locked closet to which he did have access. He did not give the plaintiff any coins because "I did not have that authority"; but he did not say anything to the plaintiff about his lack of authority, nor did the plaintiff ask about it. He called the chairman *before* writing the bill of sale, to ask if he had any objection to a bulk sale of all the remaining silver coins for $15 each. When the chairman said he had none, Jones then wrote out the bill of sale and the plaintiff left.

Within an hour of the plaintiff's departure, Sara Swenson, another member of the three-member board of selectmen, entered the office, and Mr. Jones asked her if she objected to one person's purchasing all the coins. Unlike Mr. Jones and the chairman, Mrs. Swenson knew of the recent rise in the price of silver. She did object to the sale, as later did the third member of the board.

At their regular meeting that evening, the selectmen voted to offer the coins for sale to the general public at the old price, but with a limit of five coins per order. The plaintiff's $2,000 was returned to him, over his objection.

This suit followed, with the plaintiff claiming damages in the form of lost profits from his inability to resell the coins. After denying the town's motion for a directed verdict, the trial court instructed the jury that they should find for the plaintiff if Mr. Jones had actual authority or apparent authority to sell him the coins. The jury found for the plaintiff and awarded damages based on a resale price of $40 per coin. The town appealed.

 Our analysis begins with the rule that anyone dealing with an agent of a municipal corporation is "bound to ascertain the nature and extent of his authority," *Smith v. Epping*, 69 N.H. 558, 560, 45 A. 415, 416 (1899), and that consequently a plaintiff "who relied upon the government official's unauthorized conduct or

statements cannot be deemed to have been injured by the government." *City of Concord v. Tompkins*, 124 N.H. 463, 471, 471 A.2d 1152, 1156 (1984); *see generally* 1A C. ANTIEAU, MUNICIPAL CORPORATION LAW § 10.26 (1984). The effect of the rule is to exclude local (and other) governments from application of the doctrine of "apparent authority."

Under that doctrine, a principal is liable for the unauthorized acts of his agent, if "the principal has either so conducted his business as to give third parties the right to believe that the act in question is one he has authorized his agent to do, or that it is one agents in that line of business are accustomed to do." *Davison v. Parks*, 79 N.H. 262, 263, 108 A. 288, 289 (1919). The doctrine "rests on the general principle of estoppel by which one who has given a false appearance to a situation is barred from denying the falsity." *Reed v. Linscott*, 87 N.H. 139, 140, 175 A. 240, 241 (1934).

In recent years, more courts have permitted limited applications of this doctrine to local governments, "to prevent unjust enrichment and to accord fairness to those who bargain with the agents of municipalities for the promises of the municipalities." *Wiggins v. Barrett & Associates*, 669 P.2d 1132, 1142 (Or. 1983); *see generally City of Concord v. Tompkins, supra* at 471-4, 471 A.2d at 1156-58. The plaintiff in such cases

> "must show a good faith reliance upon the municipality's conduct, lack of actual knowledge or lack of the means of obtaining actual knowledge of the facts in question, and ... a change in position to the extent that plaintiff would incur 'a substantial loss were the local government allowed to disaffirm its previous position.'"

*Parker v. West Bloomfield Twp.*, 60 Mich. App. 583, 592, 231 N.W.2d 424, 428 (1975) (quoting 2 C. ANTIEAU, MUNICIPAL CORPORATION LAW § 16A.01, at 16A-7 (1973)); *see City of Concord v. Tompkins, supra* at 468, 471 A.2d at 1154; *Wiggins v. Barrett & Associates, supra* at 1146 (Linde, J., specially concurring).

We need not decide whether to depart from our existing rule and follow this trend because, in this case, there was no change in position. If the plaintiff, relying on his agreement with Jones, had contracted to sell 386 silver coins to a third party for $40 each, and if the other elements of apparent authority were present, the town might have been liable under the modern rule; however, that is not the case here. *See City of Concord v. Tompkins, supra* at 471, 471 A.2d at 1157-58. Nor did the town retain any benefit here, as the government did in *Wiggins v. Barrett & Associates supra; see also Marrone v. Town of Hampton*, 123 N.H. 729, 735-36, 466 A.2d 907,

910–11 (1983). The plaintiff's position after the aborted sale was no worse than it had been before.

Accordingly, we hold that the doctrine of apparent authority has no possible application to this case, and should not have been submitted to the jury.

There remains the possibility that Mr. Jones had actual authority to sell the coins in bulk. He could only acquire such authority by delegation from a majority of the selectmen, who have statutory power to "manage the prudential affairs of the town." RSA 41:8; *Marrone v. Town of Hampton*, 123 N.H. at 735, 466 A.2d at 910; *see generally* 10 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 29.15 (3d rev. ed. 1981).

Delegation of authority to an agent may be either express or implied, but it must involve some conduct of the principal (here the selectmen) indicating an intent that the agent should have the authority in question. *See generally* H. REUSCHLEIN AND W. GREGORY, HANDBOOK ON THE LAW OF AGENCY AND PARTNERSHIP § 14 (1979). In this case, two selectmen testified, and the plaintiff concedes, that the selectmen never expressly granted to Mr. Jones the authority to sell coins in bulk. The plaintiff argues, however, that they granted that authority by implication.

We disagree. "The doctrine of implied actual authority focuses upon the *agent's* understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 670 n.7 (D.C. App. 1983) (emphasis in original).

Whether implied authority "follows as a reasonable incident or construction of the terms" of express authority, *Reed v. Linscott*, 87 N.H. at 140, 175 A. at 241, or results from acquiescence by the principal in a course of dealing by the agent, *Lamoureux v. Morin*, 72 N.H. 76, 77, 54 A. 1023, 1024 (1903), "an agent has no implied authority unless he believed that he had such authority." *Columbia Outfitting Co. v. Freeman*, 36 Cal. 2d 216, 219, 223 P.2d 21, 24 (1950).

The plaintiff laid great emphasis, both at trial and in this appeal, on the almost unlimited authority regarding the coins which was given by the selectmen to the anniversary committee and to him in 1975. He notes the lack of any per-order limit on the signs announcing the sale of coins at the town offices. He also points out that the

official description of the administrative assistant's duties includes the broad directive to "[f]ollow through on all town projects as Selectmen's representative." All of these facts might lead an outside observer to think that Mr. Jones had authority to sell all of the coins.

As we have seen, however, the crucial question here is not whether a third party could reasonably believe that Mr. Jones had been given the authority to sell coins in bulk, but whether Mr. Jones himself believed it. The evidence indicates overwhelmingly that he did not.

Jones had referred all previous requests for bulk sales to the selectmen. When the plaintiff asked to purchase all the remaining silver coins, Jones refused to deliver any coins to him at that time (even though the plaintiff had sufficient cash to purchase 133 coins), and made a point of asking the chairman of the board of selectmen for his approval of the sale. An hour later, he asked a second member of the board for her approval. These acts are incompatible with a belief on Jones' part that he could approve the sale unilaterally.

 If Jones wished the plaintiff to believe that the sale had been completed, due to Jones' belief that the transaction would be beneficial to the town and his consequent desire to prevent the plaintiff from having second thoughts, that says nothing about his actual authority to sell the coins. It only indicates that, after talking to the chairman, be believed that getting the approval of a majority of the selectmen would be no more than a formality. It is clear, however, that he considered that approval essential to the consummation of the sale. Accordingly, we hold that Mr. Jones had no authority to bind the town in this matter. The defendant's motion for a directed verdict should have been granted.

*Reversed.*

DOUGLAS, J., did not sit; the others concurred.