625 A.2d 424

J. Allan OFFEN

v.

COUNTY COUNCIL FOR PRINCE GEORGE'S COUNTY,
MARYLAND SITTING AS THE DISTRICT COUNCIL.

No. 1445, Sept. Term, 1992.

Court of Special Appeals of Maryland.

May 3, 1993.

Reconsideration Denied June 29, 1993.

528

Russell W. Shipley (Arthur J. Horne, Jr. and Meyers, Billingsley, Shipley, Rodbell & Rosenbaum, P.A., on the brief), Riverdale, for appellant.

Joyce Birkel Nichols, Upper Marlboro, for appellee.

Argued before ALPERT, FISCHER and CATHELL, JJ.

CATHELL, Judge.

Appellant, J. Allan Offen, appeals from the decision of the Circuit Court for Prince George's County (1) affirming the comprehensive rezoning plan approved by the County Council for Prince George's County sitting as the District Council, appellee; and (2) finding that the actions of the County prior to the adoption of the comprehensive rezoning in denying a sewer upgrade permit and other actions of the County in respect to appellant's commercially-zoned property, pending rezoning, were not illegal, arbitrary or capricious; and (3)

**530**

finding that no vested rights in the prior zoning exists. Offen presents two questions, which we rephrase as follows:

1. Whether the actions of the administrative and legislative officials constituted a regulatory "taking" for which appellant is entitled to compensation.

2. Whether a zoning estoppel was created by the actions of administrative officials of Prince George's County that delayed appellant's ability to procure building permits and begin construction and thus create a vested interest in the prior zoning.

### *The Facts*

Appellant acquired the subject property[1] in 1969 and promptly had the property rezoned to commercial in 1970. A fair interpretation of the somewhat confusing contradictory factual statements of the parties indicates that the planning staff of the County[2] objected to this initial rezoning but was overruled by the District Council. This rezoning was granted upon the condition that prior to any development the property and its site plan had to be reviewed by the District Council for final approval. At that point, appellant's first serious problem began. The Washington Suburban Sanitary Commission (WSSC), due to sewage treatment capacity problems, declared a moratorium on development affecting most of Prince George's County that lasted for almost ten years.

When the moratorium was removed, appellant began the process of development by formulating various plans, which ultimately coalesced into plans for a commercial medical campus. Informal representations were made to county officials. Some of the officials publicly, but informally, commented favorably as to the conceptual use of the subject property.

---

1. We do not identify the property because its identity is of little importance in our resolution of the issues.

2. Unless the text indicates otherwise, we shall refer to the District Council, the Prince George's County Planning Board, and the County's Department of Environmental Services/Resources as "County" interchangeably.

Thereafter, appellant undertook the normal preliminary process of planning for the development, *i.e.*, architectural and land planning, engineering, legal preparation, marketability control, etc. Plans designed to meet the conditions attached to the 1969/70 rezoning were then formally transmitted to the Council in 1988.

Just prior to submitting his plans in 1988, appellant requested, by application to the County's Department of Environmental Services, that the County upgrade the sewer status of his property from category four to category three. For the purpose of our resolution of the issues, we assume that category three, if obtained, would have enabled appellant to apply for the required permits that would have given him the right to commence construction and *perhaps* vest an interest in his then existing commercial zoning. Rather than upgrade appellant's sewer status to category three, or leave it in category four, the County downgraded it to category six. Appellant argues, without challenge by appellee, that this was the first time in the history of the categorizing of sewer classifications that sewer availability was downgraded upon an upgrade request.

Appellant immediately filed suit in state court for a writ of mandamus to require the County to issue a category three designation. Three days before the mandamus hearing, the County requested removal of this manifestly state action to federal court. Upon a motion to remand, which was not opposed by the County, the federal court sometime thereafter remanded the case to the state court. Finally, on the 22nd of August 1991, the Circuit Court for Prince George's County opined:

> Plaintiffs met the criteria established . . . for the approval of Service Area Redesignation Requests. Therefore the denial [of the 1988 request] did not fall within the County's discretion and was arbitrary and capricious. . . .
>
> . . . .
>
> . . . Most significantly, Plaintiffs' property was zoned C–O . . . and C–2 . . . to allow Plaintiffs' proposed development.

Additionally, Plaintiffs' proposed use meets the further stipulations of the 1970 Bowie Master Plan....

In the same opinion, the trial court ordered that the County "shall redesignate Plaintiff's Property from Water and Sewer Service Area Six to Service Area Three." The order related back to the County's arbitrary actions in denying the 1988 request and was an immediate order. In complete disregard of the order, the County took the cavalier attitude that, rather than obey or appeal the court order, it would wait until the next scheduled round of sewer reclassifications to reconsider appellant's sewer upgrade request. During all of these events, the County's planning staff was energetically working on the comprehensive master plan and new sectional map amendment (SMA) for the area that included appellant's property. The staff recommended, as it had in 1970 and in 1975, that the property be put into a residential classification.

The County, of course, was aware of the fact that by the time the next scheduled regulatory sewer and water designation review occurred, it was probable that a proposed SMA would be adopted by the Council and thus freeze any application to develop under the then existing sectional map.[3] When the County finally moved the property into sewer category three, the SMA had been adopted. Thus, the property became subject to the comprehensive rezoning to residential use prohibiting commercial development.

Throughout the period of the mandamus litigation, appellant continued his attempt to obtain site plan approval pursuant to the 1969/70 rezoning conditions. During this process, the planning board staff recommended denial of the site plan because of comments regarding transportation contained in a recently adopted Master Plan of an area encompassing the

---

3. The record extract is unclear as to when the sectional map was transmitted. The printed face sheet has a caption which reads: "July 1991." We assume that the sectional map is printed or prepared before it is transmitted. Thus, that date, "July 1991," was prior to transmittal. At oral argument, counsel for appellee was unable to furnish the actual date of transmittal.

subject property. The Planning Board denied the site plan approval based upon the new *proposed* SMA, stating in part:

The Master Plan also proposes residential land use for this property ... the new Sectional Map Amendment will be adopted in early Fall 1991.

. . ,. .

The Detailed Site Plan is in conformance with the applicable conditions of the previously approved Detailed Site Plan ... the previously-approved Conceptual Site Plan ... and the previously-approved Master Plan.... [It] is not in conformance with the most current Master Plan....

Even when a new master plan is adopted, until, and if, comprehensive rezoning pursuant to it occurs, the original zoning controls the uses of the subject property. The transmittal of a SMA to the enacting authority during the rezoning process *may* freeze applications pending its adoption. It appears that at this point the SMA *had not* been transmitted in the case *sub judice.*

As we have stated, by the time category three was granted to appellant in October of 1991, the SMA had been adopted.

### Comprehensive Rezoning

It is well established, and neither party contests, that the SMA was a comprehensive rezoning, and thus it is entitled to the same presumption of validity as original zoning. *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 66, 254 A.2d 700 (1969). In *Norbeck,* the Court of Appeals stated:

The broad test of the validity of a comprehensive rezoning is whether it bears a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare, and such zoning enjoys a *strong presumption of validity and correctness.* A property owner has no vested right to the continuance of the zoning status of his or neighboring property, merely the right to rely on the rule that a change will not be made unless it is required for the public good....

. . . .

... For an individual property owner to escape the binding impact of a comprehensive rezoning he must show that the plan lacks the necessary relationship to the general public interest and welfare that is presumed or that the effect of the plan is to deprive him of any reasonable use of his property.

254 Md. at 66–67, 254 A.2d 700 (citations omitted). *See also Howard County v. Dorsey*, 292 Md. 351, 363, 438 A.2d 1339 (1982) ("Comprehensive zoning or rezoning must be well thought out, the product of careful consideration and extensive study, and based upon considerations concerning the common needs of a particular area."); *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 706, 376 A.2d 483 (1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978) ("[T]he rezoning was comprehensive and bore a substantial relationship to the public health, comfort, safety ... [A]s such it enjoys a strong presumption of validity."); *JMC Constr. Corp. v. Montgomery County*, 54 Md.App. 1, 17, 456 A.2d 931 (1983); *Montgomery County v. Horman*, 46 Md.App. 491, 495, 418 A.2d 1249 (1980) ("Zoning decisions ... made during a comprehensive rezoning ... are strongly presumed to be correct. The reason ... is that ... the County Council is not considering individual properties ... it is considering the overall needs ... of the County. ...") (citations omitted); *Stump v. Grand Lodge of Ancient, Free & Accepted Masons*, 45 Md.App. 263, 269, 412 A.2d 1305 (1980) ("Zoning decisions which are made during a comprehensive rezoning process are strongly presumed to be correct. ... [D]uring comprehensive rezoning ... a County Council is exercising ... its 'plenary' legislative power. The power ... is limited only by the constitutional restriction that [it] 'bears a substantial relationship to the public health. ...' ").

In *County Council v. District Land Corp.*, 274 Md. 691, 701–02, 337 A.2d 712 (1975), the Court was faced with a similar factual scenario and opined:

[W]e turn to the question whether the rezoning bore a substantial relationship to the public health, comfort. ... If

it did, the rezoning enjoys a strong presumption of validity and correctness, *Montgomery County Council v. Leizman, supra,* 268 Md. [621] at 622 [303 A.2d 374 (1973) ]; *Norbeck Village Joint Venture v. Montgomery County Council, supra,* 254 Md. [59] at 66 [254 A.2d 700 (1973) ]. Indeed it is entitled to the same presumption of correctness as that enjoyed by an original zoning, and persons attacking the correctness of the classification have a heavy burden in overcoming the presumption of its validity, *Scull v. Coleman, supra,* 251 Md. [6] at 10 [246 A.2d 223 (1968) ]. *Compare Carl M. Freeman Associates, Inc. v. State Roads Comm'n,* 252 Md. 319, 329, 250 A.2d 250 (1969).

*See also Mandel and S. Properties, Inc. v. Board of County Comm'rs,* 238 Md. 208, 219, 208 A.2d 710 (1965); *Town of Somerset v. County Council,* 229 Md. 42, 47–48, 181 A.2d 671 (1962). The Court in *District Land,* quoting C. Ryhne, *Municipal Law* § 9–4 (1957), at 229–30, stated: "As a general rule, the motives, wisdom or propriety of a municipal governing body in passing an ordinance are not subject to judicial inquiry." 274 Md. at 705, 337 A.2d 712. The Court then opined that "[t]he same principle applies to zoning ordinances, which are presumed to be valid." 274 Md. at 705, 337 A.2d 712.

We shall not further address the presumption of validity issue other than to hold that the presumption of validity has not been rebutted. Appellant's primary complaint, however, alleges that it was the administrative actions leading up to the comprehensive rezoning which wrongfully interfered with his rights under the pre-existing commercial zoning. He maintains that appellee should be estopped from denying him a permit under the pre-existing zoning. In combination, he asserts that his constitutional rights against a confiscatory taking have been violated.

## I

**Whether the adoption of the rezoning plan constituted a regulatory taking for which appellant is entitled to compensation.**

■ Before reviewing the applicable law, we must first address a preliminary matter raised by appellee. Appellee argues that appellant's Fifth Amendment claim is premature because he has not exhausted his administrative remedies. Appellee, however, fails to further inform the court of the factual specifics of this argument.

As we have said, this appeal arises from (1) the circuit court's decision to affirm the District Council's enactment of a Sectional Map Amendment (SMA) that downzoned appellant's property, and (2) the trial court's decision that the County's actions prior to the rezoning in denying appellant the use of his property under the pre-existing zoning were not improper. It is unclear from appellee's brief whether it argues that appellant must first file for a rezoning of his property or apply for variances and then appeal the anticipated denial in order to exhaust his administrative remedies. As we view the process undertaken below by the County, it left only this avenue of judicial review available to appellant.

Appellee cites *Williamson Co. Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), as support for its argument that appellant has not exhausted his administrative remedies. It is true that the *Williamson* Court stated that certain exhaustion theories were applicable in that case. 473 U.S. at 186–97, 105 S.Ct. at 3116–22. Nevertheless, there are important distinctions between *Williamson* and the case *sub judice*. *Williamson* was a civil claim filed pursuant to 42 U.S.C. section 1983 for damages against the Planning Commission, its members, and its staff. The instant case is a comprehensive complaint as to the administrative and legislative actions taken by appellee. No claim for damages remains. Appellee utilized its administrative powers to stymie permitted development until it could use its legislative powers to prohibit development. Appellant attacked that process in the circuit court and further attacks it here.

Additionally, the *Williamson* Court opined that the action was not ripe because the property owner there had "not yet

obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property [4] nor utilized the procedures Tennessee provides for obtaining just compensation...." 473 U.S. at 186, 105 S.Ct. at 3116. This holding, however, has virtually no applicability in our case. Appellant in the case *sub judice* is appealing the District Council's final decision regarding the application of the rezoning and SMA to his property *and* its prior activities in denying him the opportunity to vest in the previous zoning. Through this suit, he is raising the taking and just compensation claims in the only available forum provided by Maryland law in these types of zoning cases. Our decision, absent certiorari to a higher court, will exhaust appellant's remedies and render a final decision on appellee's legislative activities as well.

■ The District Council's activities throughout the process were, for the most part, primarily administrative in nature. Only the final activity of approving the comprehensive rezoning plan was legislative. Additionally, the trial judge noted that the case was a B Rule appeal and that as finally presented, appellant was seeking "reversal of the decision of the ... District Council and ... remand ... with instructions to reconsider its decision with reference to the subject property." While the defense of failure to exhaust administrative remedies may be raised at any time, we note that appellee did not raise this issue at the trial court. Appellee chose, instead, to address appellant's issues directly, rather than peripherally, by attempting to force appellant to apply for variances, etc., when it was preordained he would not get them.

---

**4.** Neither party has directed us in their briefs to any provision of the zoning ordinance which would allow appellant's project to qualify for a special exception or variance permitting the commercial use in the newly rezoned residential area. Additionally, neither party has furnished the applications, if any, for exceptions or variances, and/or the rulings regarding any such application. Both parties agree that the comprehensive rezoning by *its terms as applied to the subject property* prohibits the desired use.

If an agency's pattern of administrative delay and obstruction, conducted for the purpose of forestalling development until legislative activity can prohibit it, were to be approved, property owners would be left with no remedy. The subsequent legislative activity would terminate the administrative remedies available under the pre-existing zoning because the statutes in effect at the time of permit denial would require that the new zoning be applied. A property owner would not be able to obtain judicial review of a future legislative action until its final enactment. When finally enacted, property owners could not attack the legislative action because they would have failed to exhaust administrative remedies under statutes that no longer exist. Whether appellee should be estopped from applying the new ordinance is a matter largely independent of whether there are variances or exceptions available under the new ordinance. One of appellant's contentions below and on appeal, that appellee should be estopped from applying the new ordinance, necessarily includes all of its provisions. Under the ordinance appellant contends is applicable, he was not required to obtain variances or special exceptions. The use he seeks was permitted. He claims that the County's actions denied him that to which he had a pre-existing right. In the context of whether he now has a right via zoning estoppel to a permit under the old ordinance, the special exception and variance provisions of the new ordinance are irrelevant.

As we have said, the trial court decided that the County's actions prior to the rezoning were not improper, but it based its decision *solely* on the fact that under Maryland's "vesting" law the new zoning applied. Thus, appellant had to comply with its provisions. The trial court failed to perceive the possible applicability of the zoning estoppel theory. Thus, its decision may not have been based on the appropriate legal theory. As we have said, the trial court found that the actions of the Council were not arbitrary, capricious or illegal, in part, because appellant had not vested under Maryland's vesting law. In making that determination, the trial court missed the

point. The issue before it was that the County's actions had improperly stopped appellant from vesting.

 Even had the trial court failed to address the issue, we could, though we would not be required to, consider it. Md. Rule 8–131; *Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 122, 591 A.2d 507 (1991) ("[W]e have recognized that an appellate court has discretion . . . to consider and decide questions not tried and decided in the trial court."): *Crown Oil and Wax Co. v. Glen Constr. Co.,* 320 Md. 546, 561, 578 A.2d 1184 (1990) ("Even if the . . . argument were a new issue, raised for the first time on appeal, this Court has discretion under Rule 8–131(a) to consider it. . . ."); *Taub v. State,* 296 Md. 439, 441, 463 A.2d 819 (1983) ("[O]ur scope of review is 'ordinarily' limited to questions raised and decided by the trial court. . . . [T]he rule . . . permits exceptions and we have occasionally decided cases on issues not previously raised."); *Coffey v. Derby Steel Co.,* 291 Md. 241, 256, 434 A.2d 564 (1981); *Panamerican Consulting Co. v. Brown,* 238 Md. 438, 447, 209 A.2d 575 (1965); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 394, 454 A.2d 367, *cert. denied,* 295 Md. 736 (1983) ("Assuming . . . that the issue was not decided below, this Court could still consider it under the circumstances of the instant case."); *Tuxedo Cheverly Volunteer Fire Co. v. Prince George's County,* 39 Md.App. 322, 327, 385 A.2d 819 (1978) ("[A]ppellate courts exercise a measure of discretion in considering issues tried but not decided below. . . ."). *See Heat Exchangers, Inc. v. Map Constr. Corp.,* 34 Md.App. 679, 681, 368 A.2d 1088 (1977).

Accordingly, we reject the Council's argument that the "taking" issue is not ripe for consideration.

## A. General Zoning Authority

In *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the United States Supreme Court stated the general law of takings as it relates to the regulation of private property:

The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. . . .

The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.

260 U.S. at 415, 43 S.Ct. at 160.[5]

The seminal case regarding the constitutionality of zoning ordinances is *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The Supreme Court first noted that zoning ordinances were, at that time, of recent vintage predating the case by approximately twenty-five years. 272 U.S. at 386, 47 S.Ct. at 117. *See Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). The *Euclid* Court, reiterating the well-established standard of review in zoning cases, opined:

The ordinance . . . and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. . . .

. . . .

. . . *[I]t must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.*

272 U.S. at 387–95, 47 S.Ct. at 118–21 (emphasis added). *See also Brend v. Confederated Tribes and Bans of Yakima Indian Nations,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989); *Midnight Sessions Ltd. v. City of Philadelphia,* 945

---

**5.** Much of our discussion, *infra,* refers to that branch of "taking" law arising from regulation of uses as opposed to "actual physical takings." Justice Marshall in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982), described an actual physical taking as:

Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. . . . [T]he government does not simply take a single "strand" from the "bundle" of property rights: it chops through the bundle, taking a slice of every strand.

F.2d 667, 676 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992) (holding that "[i]n instances in which a state 'reasonably conclude[s] that the "health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land,' does not require compensation until the adverse affect on the real property interests reaches a certain magnitude."); *Elias v. Town of Brookhaven,* 783 F.Supp. 758, 760 (E.D.N.Y.1992) (holding that cases claiming that government action requires just compensation must be determined on an *"ad hoc"* basis); *Kasdon v. G.W. Zierden Landscaping, Inc.,* 541 F.Supp. 991, 997–99 (D.Md.1982) (holding that plaintiffs' claim that cloud was cast upon their title coupled with sovereign immunity asserted by the government gave rise to an unconstitutional taking was without merit because plaintiffs did not allege any harm other than to "future, speculative, opportunities."); *Barrett v. Poinsett County,* 306 Ark. 270, 811 S.W.2d 324, 325 (Ark.1991) ("[R]egulations affecting less than all of the use or all of the value of property, remain to be considered on the particular circumstances of each case."); *Wilson v. Commonwealth,* 31 Mass.App.Ct. 757, 583 N.E.2d 894, 899 (1992), *aff'd,* 413 Mass. 352, 597 N.E.2d 43 (1992) ("[A] taking may still occur if the State regulates property in such a way that it 'does not substantially advance legitimate state interests, or denies an owner economically viable use of his land.' ") (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (footnote omitted)).

■ Additionally, mere diminution in value, absent zoning ordinances that are clearly arbitrary and capricious or that create a denial of all reasonable use, will not constitute a taking. *Steel Hill Dev., Inc. v. Town of Sanbornton,* 469 F.2d 956, 963 (1st Cir.1972) ("The estimated worth, had Steel Hill's original plans been approved, is irrelevant. Though the value . . . has been decreased considerably, it is not worthless or useless so as to constitute a taking.") *See also Scott v. Greenville County,* 716 F.2d 1409, 1421–22 (4th Cir.1983) (holding that while the right to a building permit prior to issuance may be entitled to protection under the Due Process

Clause, non-issuance of a permit does not destroy the value of the underlying property and thus there is no taking claim); *Hagerstown Kitchens, Inc. v. Board of County Comm'rs*, 547 F.Supp. 46, 48 (D.Md.1982), *aff'd*, 707 F.2d 506 (4th Cir.1983), *cert. denied*, 464 U.S. 847, 104 S.Ct. 152, 78 L.Ed.2d 141 (1983) ("Before a court can conclude that there has been an unconstitutional taking of property, the government regulation must deprive the landowner of all reasonable uses of his land."); *Kent Island Joint Venture v. Smith*, 452 F.Supp. 455, 460 (D.Md.1978) (holding that the regulation must "render the property worthless or useless. It is not enough . . . that the regulation causes a severe decline in the property's value.") (citations omitted).

In *Mayor of Rockville v. Stone*, 271 Md. 655, 663, 319 A.2d 536 (1974), the trial court found that rezoning had dispossessed the owners of "two-thirds of their original investment" and the diminution in value destroyed the greater part of the property's value; thus, the rezoning was an unconstitutional confiscation. The Court of Appeals, however, held:

> The record is devoid of evidence which would demonstrate that the owners were denied *all* reasonable use. . . . [W]e hear only that infamous incantation of "financial hardship" so often disavowed by this Court. It is not with a deaf or a totally unsympathetic ear that we listen to the details of the financial disaster which may result. . . . Nevertheless . . . we do not find that this property has been unconstitutionally confiscated.

271 Md. at 664, 319 A.2d 536 (citation omitted). *See also Howard County v. Dorsey*, 292 Md. 351, 365 n. 6, 438 A.2d 1339 (1982) (rejecting the contention that fifteen acres of residential property contained "in a sea of hundreds and hundreds of acres of industrially zoned land" had no viable value because a single family home had already been constructed, the fifteen acres were abutted on at least two sides by residentially-zoned property, and three units per acre could be developed under its present classification); *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 724, 376 A.2d 483 (1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55

L.Ed.2d 769 (1978) ("[O]nly that permissible densities ... have been significantly decreased; that showing is ... insufficient to demonstrate a confiscatory exercise...."); *Governor of Maryland v. Exxon Corp.*, 279 Md. 410, 437, 370 A.2d 1102 (1977), *aff'd*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (holding that a statute that prohibited producers and refiners from directly operating retail service stations did not constitute a taking because they were not deprived of all beneficial uses of their property); *Stratakis v. Beauchamp*, 268 Md. 643, 654, 304 A.2d 244 (1973) ("In order to obtain a rezoning on the basis of an unconstitutional confiscation, an applicant must show that he has been deprived of *all* reasonable use of his property and that it cannot be used for *any* of the permitted uses in the existing zone."); *Krieger v. Planning Comm'n*, 224 Md. 320, 323, 167 A.2d 885 (1961) (holding that restrictions for the public welfare were permissible even though the restrictions resulted in serious financial loss to the owner.); *Greenberg v. State*, 66 Md.App. 24, 34–36, 502 A.2d 522, *cert. denied*, 305 Md. 621, 505 A.2d 1342 (1986) (holding that airport noise regulations and county zoning ordinances which restricted certain development and adversely affected the value of property did not constitute a taking because the owner was not deprived of all beneficial use of the property considering the fact that there were a number of permitted uses consistent with the noise zone regulations and county zoning ordinances); *Anne Arundel County v. Maryland Nat'l Bank*, 32 Md.App. 437, 444, 361 A.2d 134 (1976) ("Suitability and feasibility ... are not the criteria for establishing confiscation...."); *Rockshire Civic Ass'n v. Mayor of Rockville*, 32 Md.App. 22, 38, 358 A.2d 570, *cert. denied*, 278 Md. 732 (1976) ("Reduction of the initially approved commercial areas would clearly result in financial detriment to the owner of the property, but unless it would deprive the owner of all reasonable use of his property, such action may not be unconstitutionally impermissible."); *Dustin v. Mayor of Rockville*, 23 Md.App. 389, 415, 328 A.2d 748 (1974), *vacated on other grounds*, 276 Md. 232, 346 A.2d 447 (1975) ("Rezoning in such a case would be impermissible only when the owner was deprived of *all* beneficial use of the

544

property."). *But see Carl M. Freeman Assocs. v. State Rds. Comm'n*, 252 Md. 319, 329, 250 A.2d 250 (1968) (holding that where the sole purpose of the ordinance was to freeze property values so that the property could be subsequently acquired for a public purpose, "the Walls of Jericho must fall....").

■ Thus, the standard has been that for there to be an unconstitutional taking there must be a physical invasion or a regulation that denies the owner all economically viable use of his property.

B. **First English Evangelical Lutheran Church v. County of Los Angeles, Nollan v. California Coastal Commission, and Lucas v. South Carolina Coastal Council**

Appellant asserts that the traditional zoning maxims we have briefly discussed above regarding constitutional taking that have remained relatively unchanged over the last sixty years, have been affected by the decisions in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), and *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The appellee incongruously cites *Lucas v. South Carolina Coastal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), as general support for the actions it has taken.

We shall address these cases, but we first note that appellant cites an article apparently for the proposition that the Supreme Court's trend in this area is away from its earlier, long-standing rulings on "taking" and confiscation. Appellant quoted in his brief from that article:

Both the *Nollan* and the *First Lutheran Church* [6] decisions are true to the underlying purpose of the Just Compensation Clause to ensure a fair distribution of the burdens of governmental activities....

... The question presented almost always is, Who is going to pay? ... Neither the *Nollan* nor the *First Lu-*

---

6. This case is frequently abbreviated to *First English Church*.

*theran Church* opinion restricts the range of regulatory options.... Severe restrictions on use can still be imposed, and extensive deductions can still be required. The clear intent of both decisions is ... to focus more light on the question of who is to bear the burdens of the costs associated with harsh land use regulation....

The teaching of these two cases is that a guiding principle of land use regulation must be a fair and just distribution of costs among the community as a whole.... [T]he courts will hence forth look more closely to ensure that the results of land use regulation reflect a reasonable accommodation of the individual rights of the owner with public concerns and that justice and fairness have been achieved. The tone of these two decisions clearly suggests that a number of years of profligate regulatory conduct has dissipated the credibility of land use regulators with the United States Supreme Court. The message ... is that unreasonable regulatory conduct which fails to consider individual rights and does not distribute the economic burdens of a land use regulation ... will be called to account....

Roland K. Best, "New Constitutional Standards for Land Use Regulation: Portents of *Nollan* and *First Lutheran Church,*" Chapter Six, *Institute on Planning, Zoning, and Eminent Domain* (1988).

We disagree with Professor Best's interpretations, and we hold that the well-established law on takings and confiscation remains unchanged. We shall explain.

The property owner in *Nollan*, 483 U.S. 825, 107 S.Ct. 3141, sought a writ of mandamus to require the issuance of an unconditional rebuilding permit. The Commission had issued the permit with a condition that the land owners grant to it a public easement across their beach front property parallel to the ocean, extending from one public beach to another public beach. The Supreme Court, by a majority, first opined:

Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the

beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking. To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather (as Justice BRENNAN contends) "a mere restriction on its use" *post,* at 834, 107 S.Ct. at 3155, n. 3, is to use words in a manner that deprives them of all their ordinary meaning.

483 U.S. at 831, 107 S.Ct. at 3145. Later, the Court, after discussing various potential scenarios relating to the Commission's purposes, then framed the issue before it as follows:

> The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation. Whatever may be the outer limits of "legitimate state interests" in the takings and land-use context, this is not one of them. . . .
>
> . . . .
>
> . . . That is simply an expression of the Commission's belief that the public interest will be served by a continuous strip of publicly accessible beach. . . . The Commission may well be right . . . but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its "comprehensive program," if it wishes, . . . but if it wants an easement across the Nollans' property, it must pay for it.

483 U.S. at 837–41, 107 S.Ct. at 3148–51.

As we perceive *Nollan,* it merely restates the law that if a governmental entity desires to acquire property for itself, it must pay for it. The governmental action in *Nollan* did not just create a regulatory taking, it actually confiscated property. It was a physical invasion. What the *Nollan* Court did was to forbid California from acquiring property rights for itself without compensating the property owners. 483 U.S. at 842, 107 S.Ct. at 3151. That has been the law almost since the advent of zoning.

In *First English Church*, 482 U.S. 304, 107 S.Ct. 2378, a flood destroyed a church campground and retreat center along the banks of a California creek. The county adopted an interim ordinance which prohibited the construction or reconstruction of any structures in an area that included the church's property. The church filed an inverse condemnation case for damages, alleging that the ordinance denied it *all use* for the temporary period and it was, therefore, a taking. The California Court of Appeals had previously held that a landowner may not recover damages until it is finally determined that the regulation constitutes a "taking." 482 U.S. at 306–07, 107 S.Ct. at 2381. Relying on the California Supreme Court's holding in *Agins v. Tiburon*, 24 Cal.3d 266, 157 Cal.Rptr. 372, 376–78, 598 P.2d 25, 29–31 (1979), the California Court of Appeals held that temporary regulatory takings do not require compensation even for the temporary period when all use is prohibited. 482 U.S. at 309–10, 107 S.Ct. at 2383. The United States Supreme Court reversed the *Agins* rule, and in a majority opinion held that in the factual scenarios previously presented, the "California courts have decided the compensation question inconsistently with the requirements of the Fifth Amendment." 482 U.S. at 311, 107 S.Ct. at 2383.

It is important to note that the United States Supreme Court carefully limited its holding to "whether the Just Compensation Clause requires the government to pay for 'temporary' regulatory takings." 482 U.S. at 313, 107 S.Ct. at 2385 (footnote omitted). The Court, like the California Court, assumed that *all* use was taken. The issue was thus limited to whether a denial of *any and all uses* for a temporary period constituted a taking. The focus was not on the extent of use limitation but, on the period of the prohibition. It was conceded that all use was prohibited.

The Court, in noting the thrust of the issue it chose to resolve, said:

> [A] governmental body may acquiesce in a judicial declaration that one of its ordinances has effected an unconstitutional taking of property; the landowner has no right under the Just Compensation Clause to insist that a "temporary"

taking be deemed a permanent taking. But we have not resolved whether abandonment by the government [of the regulations] *requires payment* of compensation for the period of time during which regulations deny a landowner *all use of his land.*

*First English Church,* 482 U.S. at 317–18, 107 S.Ct. at 2387 (emphasis added). The Court concluded:

> We *merely hold* that where the government's activities have already worked a taking *of all use of property,* no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.

482 U.S. at 321, 107 S.Ct. at 2389 (emphasis added).

As we perceive the majority opinion in *First English Church,* it was limited to the requirement that temporary prohibitions of all uses require compensation. The United States Supreme Court and the Maryland courts have held since the advent of the regulation of uses that a prohibition of *all* uses constitutes a taking.[7] In that regard, *First English*

---

7. We note, however, that in colonial days it was not unusual for governments regularly to take property without compensation. When James Madison authored the Takings Clause of the Fifth Amendment, its ultimate ratification was a "translation of liberal idealogy into constitutional principle." William Michael Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment,* 94 Yale L.J. 694 (1985). As Treanor explains, the constitutional framers of post-colonial days perceived uncompensated takings as feudal redistributions of private property back to the government, *i.e.,* the king. That concept, through escheat statutes and conditions of early grants, persisted in colonial days. The Takings Clause was thus considered to be a liberalization of property rights adverse to the conservative interests of the preconstitutional colonial governments. The right to private property was then perceived to be one of the incidents, privileges and immunities constituting individual rights that should be free from governmental interference.

Maryland was one of only three states that had a Takings Clause in its first constitution. *Id.* at 698, n. 15 (citing 3 F. Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies, Now or Heretofore Forming the United States of America* 1688). Even then, there were no "just compensation" provisions, but the property could not be taken without the consent of

*Church* offers no new law or substantial change in the Court's prior position. *See also McDougal v. County of Imperial,* 942 F.2d 668, 676 (9th Cir.1991) ("We cannot agree that any legitimate purpose automatically trumps the deprivation of all economically viable use ... [W]e do not read either *First English* opinion as holding that any legitimate state interest insulates the state from takings exposure."). *See also Midnight Sessions Ltd v. City of Philadelphia,* 945 F.2d 667, 675–77 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); *Cornish Town v. Koller,* 817 P.2d 305, 312 (Utah 1991) ("Even a 'temporary' regulatory taking would require a denial of 'all uses' of their property.")

In *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), Lucas purchased two oceanfront lots on a barrier island off the South Carolina coast in 1986. He intended to construct single-family homes on the property. At the time he purchased the lots, there were no regulations establishing a complete prohibition on the construction of homes. Subsequent thereto, South Carolina passed the Beachfront Management Act (Act). The Act prohibited Lucas from constructing any permanent habitable structures on the lots. He initiated suit, alleging that the Act constituted an unconstitutional "taking of his property without just compensation." —— U.S. at ——, 112 S.Ct. at 2890. The trial court determined that the Act rendered the lots valueless and was thus an impermissible confiscation. The South Carolina Supreme Court, reversing, held that when a regulation is designed "to prevent serious public harm, no compensation is necessary under the taking clause, regardless of the Act's effect on the value of the property." [8] —— U.S. at ——, 112 S.Ct. at 2890.

---

the owner or the Legislature. *Id.* at 698. Vermont was the first state to require "just compensation" in its 1777 constitution. *Id.* at 701.

**8.** Two judges dissented, pointing out that the Act's "chief purposes" was to promote tourism and to create an environmentally attractive "habitat for indigenous flora and fauna," not to prevent harmful or noxious uses. —— U.S. at ——, 112 S.Ct. at 2890 (quoting *Lucas v.*

Lucas did not challenge the validity of the Act as a legitimate exercise of the police power but claimed that:

[T]he Act's *complete* extinguishment of his property's value entitled him to compensation regardless of whether the legislature had acted in furtherance of legitimate police power objectives.

—— U.S. at ——, 112 S.Ct. at 2890 (emphasis added). The South Carolina Supreme Court based its holding on *Mugler v.* *Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), and its progeny,[9] which the Court interpreted to mean that regulations preventing public nuisances, *i.e.,* harmful or noxious uses, do not create compensable takings under the Takings Clause.

In delivering the Supreme Court's majority opinion, Justice Scalia began by noting that in *Pennsylvania Coal Co. v.* *Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922),[10] the Supreme Court had first recognized:

---

*South Carolina Coastal Council,* 304 S.C. 376, 396, 404 S.E.2d 895, 906 (1991)).

9. *Mugler* was, in part, based on *Pumpelly v. Green Bay & Mississippi* *Canal Co.,* 80 U.S. (13 Wall.) 166, 177–81, 20 L.Ed. 557 (1871) (holding that a taking occurred where flooding of the plaintiff's property amounted to "an almost complete destruction of the value of the land."). Its progeny included *Reinman v. City of Little Rock,* 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900 (1915) (holding that the exercise of police power was valid where an owner was prohibited from operating a livery stable business that was not a nuisance *per se* ); *Hadacheck v.* *Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (holding that an ordinance passed for the health and comfort of the community that prohibited brickmaking in a designated area was a valid exercise of police power); *Miller v. Schoene,* 276 U.S. 272, 277–79, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (holding that an ordinance requiring cedar tree farmers to cut down a number of their trees to prevent the spread of an infectious disease to apple orchards was valid on the grounds that one class of property had a greater value to the public than the other); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 594–95, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962) (holding that an ordinance regulating dredging and pit excavating was a valid exercise of police power wherein it prevented the defendant from further excavation below the water table).

10. Prior to *Mahon,* only direct appropriation or "the functional equivalent" of a "practical ouster of [the owner's] possession" could constitute

If ... the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." These considerations gave birth in that case to the oft-cited maxim that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

—— U.S. at ——, 112 S.Ct. at 2892–93 (citations omitted). He then noted, that in seventy years of jurisprudence, the question of "too far" had been decided on an *ad hoc* basis,[11] except that the Court had in the process carved out two categories of "regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the re-

---

a constitutional taking. —— U.S. at ——, 112 S.Ct. at 2892 (brackets in original).

11. The Supreme Court has found that a regulation resulted in an unconstitutional taking on only six occasions, beginning with *Pennsylvania Coal*, 260 U.S. 393, 43 S.Ct. 158. The cases include *Lucas*, —— U.S. ——, 112 S.Ct. 2886 (holding that a regulation prohibiting a landowner from building houses on his beachfront property denied him all economically viable use of his land and therefore was a taking requiring compensation); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421, 102 S.Ct. 3164, 3168, 73 L.Ed.2d 868 (1982) (holding that a New York law which required a landlord to permit a cable television company to install its cable facilities on his property was a taking); *Kaiser Aetna v. United States*, 444 U.S. 164, 172–73, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979) (holding that the government could not require a landowner who improved his marina so that it fell within the definition of a navigable water to grant the public access without compensation); *Armstrong v. United States*, 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960) (holding that the confiscation of boats encumbered by materialmens' liens was a taking requiring just compensation); *United States v. Causby*, 328 U.S. 256, 261–62, 66 S.Ct. 1062, 1066, 90 L.Ed. 1206 (1946) (holding that the invasion of airspace below the government's navigational servitude was a taking). *See* Robert M. Washburn, *Land Use Control, the Individual, and Society: Lucas v. South Carolina Coastal Council*, 52 Md.L.Rev. 162, 166–67 n. 26 (1993). Professor Washburn included *Nollan*, 483 U.S. 825, 107 S.Ct. 3141, in his discussion of regulatory takings found by the Court. As we perceive *Nollan*, however, it was a physical taking case. Additionally, *First English Church*, 482 U.S. 304, 107 S.Ct. 2378, is not among the cases in which a regulatory taking was found because a complete taking was stipulated in that case.

straint." —— U.S. at ——, 112 S.Ct. at 2893. The first category is physical invasion of an owner's property "no matter how minute the intrusion, and no matter how weighty the public purpose behind it. . . ." —— U.S. at ——, 112 S.Ct. at 2893. The second category is where the "regulation denies all economically beneficial or productive use of land." —— U.S. at ——, 112 S.Ct. at 2893. In a footnote caustically criticizing Justice Blackmun's dissent, the majority noted, in part, that:

> [t]he cases say, repeatedly and unmistakably, that "[t]he test to be applied in considering [a] facial [takings] challenge is fairly straightforward. A statute regulating the uses that can be made of property *effects a taking if it 'denies an owner economically viable use of his land.'"*

—— U.S. at ——, n. 6, 112 S.Ct. at 2893 n. 6. Speaking of the rule as extant, Justice Scalia again commented that "the Fifth Amendment is violated when . . . [a land use regulation] *denies an owner economically viable use of his land."* —— U.S. at ——, 112 S.Ct. at 2894. He then stated that the Supreme Court had never set forth the justification for the rule because "[p]erhaps it is simply . . . that *total* deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." —— U.S. at ——, 112 S.Ct. at 2894 (emphasis added). Interestingly, again in a footnote, during this particular dispute between Justices Scalia and Blackmun, Justice Scalia noted:

> Justice BLACKMUN describes that rule (*which we do not invent but merely apply today*). . . . Justice BLACKMUN's real quarrel is with the substantive standard of liability we apply in this case, *a long-established standard we see no need to repudiate.*

—— U.S. at —— n. 6, 112 S.Ct. at 2893–94 n. 6 (citations omitted, emphasis added).

The *Lucas* majority, as we have indicated, repeatedly tells us that it is not adopting a new rule. The South Carolina Legislature in *Lucas* attempted to create legislation that would permit the State to *deny a landowner all viable and*

*economical use* of his property. In essence, the South Carolina Legislature's attempt was based on the creative and unique theory that any economically viable use of coastal property was harmful and noxious and thus regulatorily enjoinable. The United States Supreme Court acknowledged that the "harmful or noxious uses" principle was the Court's early method of ascribing a reason for permitting regulation that incidentally devalued property without requiring compensation under the Takings Clause. —— U.S. at ——, 112 S.Ct. at 2897. After discussing the subsequent evolution of the concept, the Court stated:

> [N]oxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation. *A fortiori* the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that *total* regulatory takings must be compensated. If it were, departure would virtually always be allowed. The South Carolina Supreme Court's approach would essentially nullify *Mahon's* affirmation of limits to the noncompensable exercise of the police power. Our cases provide no support for this: None of them ... employed the logic of "harmful use" prevention to sustain a regulation ... that ... *wholly* eliminated the value of claimant's land.

—— U.S. at ——, 112 S.Ct. at 2899 (emphasis added, citations omitted, footnote omitted).

The Court, however, went on to acknowledge that when all use is prohibited, the State might be able to avoid payment of compensation if the status of the title prohibited a use, *i.e.*, that which is prohibited could not be done in any event under the particular title.[12] The Supreme Court "reasoned that

---

12. Under *Lucas*, the majority reasoned that the only use that could be regulated to the extent that all viable economic use could be denied without compensation, other than the regulation of traditional nuisances, would be property where the title status did not permit the use as of right. An example is the regulation of riparian rights by the Maryland Wetlands Act of 1970, as interpreted by the Court of Appeals in *Board of Public Works v. Larmar Corp.*, 262 Md. 24, 277 A.2d 427 (1971), holding

under common-law ... no owner of land had any right to use his land in a manner harmful to others. Accordingly, a regulation ... preventing or abating such an unlawful use took nothing at all...." Washburn, *Land Use Control, supra* at 193 (footnote omitted). The *Lucas* court, however, clearly refused to allow regulations that destroy all economic use to be "newly legislated or decreed." *Id.* at 197. Justice Scalia concluded:

> Any limitation [regulations prohibiting all economical use of land] so severe cannot be newly legislated or decreed (without compensation) but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance *already* place upon land ownership. A law or decree with such an effect, must ... do no more than duplicate the result that could have been achieved ... under the State's law of private nuisance....[13]

---

essentially that such rights generally have as their purpose "to assure to the riparian owner ... would never be cut off from his access to water." 262 Md. at 36, 277 A.2d 427. Also, no vested rights to improvements in navigable water exist until they are built, and that in any event the "waters ... and the land under them are the property of the State." 262 Md. at 46, 277 A.2d 427. Thus, a reasonable argument can be made, as Maryland law post *Larmar* so holds, that the State can regulate all use seaward or channelward of mean high water without providing compensation to riparian owners. Maryland's critical area legislation is not based on the same theory as wetlands legislation, *i.e.*, title. Maryland's critical area legislation, however, does provide a full array of procedures designed to permit heavily regulated and conditioned uses. Additionally, it provides, at least facially, methods to permit property uses—methods not extant in the South Carolina Act.

13. In *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 173 n. 2 (4th Cir.1991), decided prior to the filing of the United States Supreme Court decision in *Lucas,* Judge K.K. Hall, dissenting, included a prophetic footnote commenting on the South Carolina Supreme Court's reliance on "noxious use" nuisance law to uphold the Act.
> I agree entirely with the [South Carolina Supreme Court] dissenters in *Lucas.* A noxious use is one that is "tantamount to a public nuisance." Living in a beach bungalow bears little resemblance to the noxious uses of property the Supreme Court has identified.... [T]he rapidity with which rental beach houses are gobbled up by the public causes me to doubt that they are, at least yet, generally regarded as "tantamount to a public nuisance."

—— U.S. at ——, 112 S.Ct. at 2899 (citations omitted, emphasis added).

As *we* perceive the majority opinion in *Lucas*, it thwarted an attempt by South Carolina to circumvent the long-established rule that generally, governmental regulation pursuant to the police power cannot regulate property to the extent that it destroys all economically viable uses without compensation. When discussing the development of land use and regulatory takings jurisprudence in *Lucas*, Professor Washburn in *Land Use Control, supra* at 188 (footnote omitted), noted that the *Lucas* majority "apparently created no new scheme or rule," and, commenting on Justice Blackmun's dissent which opined otherwise, stated, "As ... persuasive as Justice Blackmun's dissent appears, its logic is not convincing." *Id.* at 191. We agree. *Lucas* made no change in the law. *Lucas* blocked an attempt to change the law. The pervasive image in the legal and environmental communities that *Lucas* somehow expanded the ability of landowners to avoid non-confiscatory regulation is, simply stated, just that—imagery, not substance.[14]

### Distinct Investment–Backed Expectations

We shall briefly distinguish the concept of investment-backed expectations as it relates to taking of real property.[15]

The modern flirtation with the *never defined* [16] concept of "investment-backed expectations" began as *dicta* in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). That case involved the

---

**14.** "It is 'clear' that the *Lucas* opinion will not create a revolution in takings jurisprudence, or open the courthouse and subject governmental entities to a flood of litigation." *Land Use Control, supra* at 212.

**15.** Appellant in his brief states: "The fact that the illegal downzoning interferes with appellants' 'investment backed expectations' is further evidence of the taking and the necessity for just compensation."

**16.** The term appears with increasing frequency as the legal community apparently grasps it as some sort of panacea modifying the traditional taking concepts. The Supreme Court has never defined it, except by the use of the term itself.

application of New York's Landmark Law to the landowners'
attempt to build a fifty-story tower in the air space over
Grand Central Station. The property owners brought suit
claiming that the application of the law to their property
constituted a taking of their property interests without com-
pensation. Specifically, they contended that the landmark law
was different from zoning laws because zoning laws applied
generally, whereas the landmark law only applied to specific
properties. The Supreme Court responded:

> It is, of course, true that the Landmark's Law has a more
> severe impact on some landowners than on others, but that
> in itself does not mean that the law effects a "taking."
> Legislation designed to promote the general welfare com-
> monly burdens some more than others.... Similarly, zon-
> ing laws often affect some property owners more severely
> than others but have not been held to be invalid on that
> account.

438 U.S. at 134, 98 S.Ct. at 2665. The Court discussed
investment-backed expectations by unnecessarily separating it
from the traditional "taking of all viable economic use" concept
by stating that it was considering "[t]he economic impact of
the regulation on the claimant ... the extent to which the
regulation has interfered with distinct investment-backed ex-
pectations...." 438 U.S. at 124, 98 S.Ct. at 2659. *See also
Land Use Control, supra* at 170 (footnote omitted). The
Court, citing *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82
S.Ct. 987, 990, 8 L.Ed.2d 130 (1962), noted again that interfer-
ence with investment-backed expectations was a relevant con-
sideration. 438 U.S. at 124, 98 S.Ct. at 2659. Distinct invest-
ment-backed expectations, however, are not mentioned in
*Goldblatt.* The only statement in *Goldblatt* even remotely
similar was that Court's statement that "[a]lthough a compari-
son of values before and after is relevant ... it is by no means
conclusive...." 369 U.S. at 594, 82 S.Ct. at 990. The *Penn
Central* Court declined to separate the segments of the inci-
dents of ownership to be compared under investment-backed
expectation theories but merely noted, again as dicta, that the
remainder of the property in any event permitted the owner

"to obtain a 'reasonable return' on its investment." 438 U.S. at 136, 98 S.Ct. at 2665. Justice Rehnquist, now Chief Justice, dissenting, noted that the *Penn Central* majority was confusing different concepts:

> The Court does little to resolve these questions in its opinion. Thus, at one point, the Court implies that the question is whether the restrictions have "an unduly harsh impact upon the owner's use of the property," ... at another point the question is phrased as whether Penn Central can obtain "a 'reasonable return' on its investment," ... and, at yet another point, the question becomes whether the landmark is "economically viable."

438 U.S. at 149 n. 13, 98 S.Ct. at 2672 n. 13. The Court concluded that, in any event, even if the concept applied, the landowner's remaining surface operations were sufficient to meet those expectations. 438 U.S. at 124–38, 98 S.Ct. at 2659–66.

The inclusion of "investment-backed expectations" language in traditional "taking" law was somewhat compounded by the use of its terms in *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). *Kaiser Aetna* involved the government's attempt to require a private marina owner to afford public access because he had opened a channel to navigable waters. At one point, the Court, in its discussion, opined: "[T]he consent [of governmental officials to the dredging] ... can lead to the fruition of a number of *expectancies* embodied in the concept of "property"—*ecpectancies* that, if sufficiently important, the Government must condemn and pay for...." 444 U.S. at 179, 100 S.Ct. at 393 (emphasis added). The "expectancy," however, the Court referred to in *Kaiser Aetna* was not related to investment. As the Court held, it was the owner's expectancy that as one of the incidents of ownership of real property, it had the right to exclude others from the property. The Court held that to interfere with that right to exclude was a physical taking. 444 U.S. at 178–80, 100 S.Ct. at 392–93. Thus, *Kaiser Aetna* is in no way an "investment-backed expectations" holding.

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982), the Court held that the conduct there was an actual physical taking, as opposed to a regulation improperly affecting economic use. It noted, however, that "economic impact . . . especially the degree of interference with investment-backed expectations, is of particular significance." 458 U.S. at 426, 102 S.Ct. at 3171. Again, however, the Court found an actual physical taking, not an interference with investment rights in the absence of a physical taking. 458 U.S. at 434–35, 102 S.Ct. at 3175.

There have been several other cases where the Court has intermingled the terms "all viable economic use" and "investment-backed expectations" or has used them interchangeably. Among those cases is *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493–99, 107 S.Ct. 1232, 1246–49, 94 L.Ed.2d 472 (1987), where the Court referred to the concepts of "economic use" and "investment-backed expectations." The Court declined to find a taking under any theory but mentioned investment-backed expectations as a theory, distinguishing *Keystone* from *Mahon*. It noted that in *Mahon*, the entire bundle of mineral rights had been extinguished, whereas the petitioners in *Keystone* were only required to leave less than 2% of their coal in place while at the same time they were permitted to mine virtually all of the coal in their mineral estates. 480 U.S. at 492–502, 107 S.Ct. at 1245–51. In the often-cited case of *Agins v. City of Tiburon*, 447 U.S. at 255, 260, 100 S.Ct. at 2138, 2141, 65 L.Ed.2d 106 (1980), the Court decided the case on traditional taking concepts, *i.e.*, whether the governmental action "denies an owner economically viable use of his land." The Court, however, mingled the concepts when it suggested that the owners were "free to pursue their reasonable investment expectations." 447 U.S. at 262, 100 S.Ct. at 2142. Moreover, the Court further stated that the ordinances which limited development did not prevent appellants from using the land for its best use nor did they "extinguish a fundamental attribute of ownership. . . ." 447 U.S. at 262, 100 S.Ct. at 2142. *In United*

*States v. Riverside Bayview Homes, Inc.,* 474 U.S. at 121, 129 n. 6, 106 S.Ct. at 455, 460 n. 6, 88 L.Ed.2d 419 (1985), the Court again mingled the concepts when Justice White stated that "we have no basis for evaluating this claim . . . [whether the denial of the permit will] prevent economically viable uses . . . or frustrate reasonable investment-backed expectations." The Court, however, held that the requirement by the Corp of Engineers that the landowner obtain a permit before filling wetlands did not amount to a taking because

> even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*Riverside Bayview Homes,* 474 U.S. at 127, 106 S.Ct. at 459. *See also Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1174 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (holding that where a "purchase of the parcel to facilitate mining was clearly a part of the *investment backing* for Benefits' *expectations* " and where the "diminution in value [of Whitney coal] was total," there was a taking). (Emphasis added, brackets in original.)

The Third Circuit Court of Appeals in *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1031 (3d Cir.1987), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 appears to have opined that an "investment-backed expectation" theory may be found only when the interference amounts to a complete destruction of property rights. The Court in *Pace* addressed an issue similar to that in the case at bar where industrial property was downzoned as part of a comprehensive rezoning. During the period leading up to the downzoning, permits were issued and buildings actually existed on some of the lots in the parcel. When Pace attempted to obtain permits for the remaining industrial lots, however, its applications were rejected because it allegedly had failed to establish water availability. *Pace* prevailed in state court, but the town continued to refuse to issue the permit notwithstand-

ing the court order. In its federal suit, *Pace* claimed damages in addition to requesting injunctive relief.

In respect to the "taking" issue Pace alleged that prior to the downzoning, its industrially-zoned property was valued at $495,000. After downzoning to agricultural, however, it was valued at only $52,000; thus, there was sufficient diminution in value to constitute a taking. Pace also argued that the regulation improperly interfered with his "reasonable, distinct, investment-backed expectations." 808 F.2d at 1032. The Third Circuit quickly disposed of the taking claim which was phrased in the language of "investment-backed expectations," noting that

"the taking issue ... is resolved by focusing on the uses the regulations permit" and on the residual value of the property.... [T]he Supreme Court has sustained land use regulations that have resulted in large reductions in value, similar to the one allegedly experienced by Pace, where the land retains significant value.

808 F.2d at 1031 (quoting *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2662).

Directing its attention to the "investment backed-expectations" argument, the *Pace* Court noted that the issue had first been discussed in *Pennsylvania Coal Co. v. Mahon,* a case involving the regulation of mineral rights where the fee estate was still in the hands of others. The regulation in *Mahon* essentially stopped mineral extraction. The Court in *Pace* then stated that investment-backed expectations had been discussed, but no taking was found in *Penn Central.* Quoting *Penn Central,* the *Pace* court noted that the Supreme Court had stated that *Mahon* did not mean one could "establish a 'taking' simply by showing that [he had] been denied the ability to exploit a property interest...." 808 F.2d at 1032 (brackets in original). The *Pace* court went on to hold that even if "distinct, investment-backed expectations are involved, a taking ... occurs only when the regulation 'has nearly the same effect as the complete destruction of [the property] rights' of the owner." 808 F.2d at 1033 (citing *Keystone*

*Bituminous Coal Ass'n v. Duncan,* 771 F.2d 707, 716 (3d Cir.1985)), *aff'd sub nom. Keystone Bituminous Coal Ass'n,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (brackets in original).

As we perceive the Third Circuit discussion in *Pace* and the Supreme Court's holding in *Pennsylvania Coal,* the theory of "investment-backed expectations" relates in the first instance to an incidental right of property, as compared to a fee simple use or fundamental right of real property. For instance, as in *Pennsylvania Coal* and the mineral rights cases, a regulation can completely destroy the ability to extract minerals while not affecting any use of the surface of the land. The owner of the mineral right and the owner of the fee estate may be different. There may well be a remaining reasonable use of the fee by its owner but no economically viable use of the mineral right by its owner. Thus, under traditional concepts of "land use" takings, the land could retain economically viable uses even though the ownership in the mineral rights is completely destroyed. It is in this type of situation that the concept of distinct investment-backed expectations does not conflict with the traditional "denial of economically viable uses" standard. There might also be personal property or other property, such as ideas, etc., that may be encompassed within the embrace of investment-backed expectations in a takings context.

In every case we have reviewed where the taking and "investment-backed expectations" concepts have been mingled, the case has been resolved under the traditional takings standard. It is only where the concepts are severed by the disparate ownership of a severable property right, *i.e., Pennsylvania Coal,* where the case has been decided on an investment-backed theory. Even then, when an investment-backed expectation theory may be applicable, the interference must be the equivalent of the "complete destruction ... of rights" in order for there to be an unconstitutional taking. *Pace,* 808 F.2d at 1033 (quoting *Keystone,* 771 F.2d at 716).

Professor Washburn in *Land Use Control, supra* at 170, noted that the concepts of economically viable use and "distinct, investment-backed expectations" have been, since *Pennsylvania Coal,* determinative in the bulk of land use regulation takings cases (quoting Michael M. Berger, Happy Birthday Constitution: The Supreme Court Establishes New Ground Rules for Land–Use Planning, 20 Urb.Law 735, 758–59 (1958)). While our review of the cases indicates that the concept of economically viable use has almost always been the determinative factor, we have found no Supreme Court case since *Pennsylvania Coal* where the concept of "distinct investment-backed expectations" has been determinative. In most cases, it appears to be incorporated within the concept of viable economical use or merely mentioned as an aside or as dicta. As we see it, the loose use of the term investment-backed expectations has created some confusion in that members of the bar and some treatise writers consider it to have made drastic changes in traditional concepts of taking. For the most part, the United States Supreme Court has not used the concept at all or has used it interchangeably or synonymically with "viable economic use." [17]

█ We hold, therefore, that there have been no substantive changes in federal and Maryland law permitting the regulation of uses, so long as all economically viable uses are not prohibited.

## II

**Whether a zoning estoppel was created by the actions of administrative officials of Prince George's County that delayed appellant's ability to procure permits and begin construction in order to vest in him an interest in the pre-existing zoning.**

---

17. Professor Washburn concludes in his article that "In all cases ... the court must [1] assess the economic impact ... and [2] the extent to which it interferes with investment-backed expectations." *Land Use Control, supra* at 216. We agree with the former, not the latter.

Appellant contends that the actions of the administrative officials in refusing to upgrade his sewer classification from category four to three prevented him from obtaining the proper building permit. Without the building permit, appellant claims that there was no possible way for his interest to vest in the pre-existing commercial zoning. Therefore, according to appellant, the administrative officials should be estopped from preventing him from going forward with his commercial zoning plans under the pre-existing zoning.

## A. Vesting Generally

We shall first discuss the rigidity of the Maryland law in requiring actual construction before vesting occurs. We shall emphasize the stringency of the Maryland vesting rule by describing, at some length, that which occurred in *Washington Suburban Sanitary Commission v. TKU Associates*, 281 Md. 1, 3–4, 376 A.2d 505 (1977). In that case, the developer had conceptualized plans to construct a large shopping mall in Montgomery County. The key issues in the case were similar to those in the case at bar. TKU involved two appeals that had been consolidated. The primary issue in one appeal was whether the trial court erred in finding that WSSC improperly withheld a sewer permit needed by TKU to begin construction. The primary issue in the other appeal was whether Montgomery County was estopped from barring TKU's project "notwithstanding an intervening downzoning" because of the alleged wrongful withholding of a sewer permit. The withholding was allegedly caused by illegal acts of the county and other governmental agencies "perpetrated prior to enactment of the downzoning resolution." 281 Md. at 4, 376 A.2d 505.

In 1971, at the time the project was conceived, the project was buildable as of right under the zoning code, provided that (1) TKU placed on record a plan of subdivision and the final plat was subject to approval by the planning commission; (2) TKU obtained a sewer hookup permit from WSSC, and (3) TKU obtained a building permit from Montgomery County. The developer expended large sums of money for preparation

of various plans and studies and for architects, surveyors, and lawyers. Numerous meetings were held with several county agencies wherein the developer fully disclosed its building plans. In 1971, the developer filed a preliminary plan. It received preliminary approval subject to its dedication of public use land and sewer availability. In 1972, prior to commencement of construction, WSSC imposed a sewer moratorium on additional sewer use because of problems associated with the Blue Plains Treatment Plant. While the moratorium was in place, the Planning Commission sought assurances from WSSC that sufficient sewer capacity would be available for the project. The developer modified its plans to provide that the proposed project would not generate any more flows than the existing business. Based on the information furnished by the developer, WSSC informed the Planning Commission that no greater flows were anticipated. In essence, WSSC indicated that as long as the redevelopment was in accordance with the approved plan, hookups would be permitted.[18]

The Planning Commission approved the final record plat after the developers made the appropriate land dedications. At that time, the developer had spent approximately $500,000. Additionally, it had dedicated property valued at $800,000 to the public. The developer then applied for a building permit which could not be issued until an actual sewer hookup permit was issued by WSSC. The developer applied for the sewer hookup permit on October 25, 1972, and prepared to begin construction within ninety days.

During the period when these events were occurring, the area at issue was under study. Of special interest was its potential for commercial development. An initial recommendation of the Planning Commission was completed in December of 1972 and, although it recommended a rezoning, the rezoning would have continued to permit the contemplated development. Nevertheless, TKU, aware that the issue was

---

18. During the moratorium, different hookups could be made provided that the total volume from any site did not increase.

still under study, vigorously pressed for the issuance of the sewer hookup permit through the end of 1972, so that it could obtain the other necessary permits and commence construction.

In early 1973, meetings were held between WSSC and the Planning Commission where concerns were raised over the accuracy of WSSC's determination that no additional flow would result from the development and whether the redevelopment was too intensive, given the ideas that were then being expressed during the ongoing study process. At a February hearing, a representative of a citizens group requested that the Planning Commission promptly downzone the area. If done promptly, TKU would be unable to obtain a building permit and commence construction.

Various studies of existing and proposed sewage flows were conducted between February and June of 1973. In June of 1973, the Planning Commission recommended a downzoning that would prohibit the planned redevelopment. TKU demanded a hearing before WSSC with respect to its application for a sewer hookup permit. Prior to that hearing, a new sewer moratorium, which prohibited the previously proposed sewer hookup was issued. TKU filed suit against WSSC. During the trial stage, Montgomery County completed a downzoning of the subject property as part of a broad sector downzoning. The downzoning was the subject of the other case consolidated on appeal.

The Court of Appeals initially opined:

We think it plain ... that the WSSC was subject to valid criticism ... from the Council and the Planning Commission, each of whom had legitimate reason to be concerned.... That they voiced their concern ... and urged the WSSC to deny the permit ... is not the equivalent of wrongful governmental pressure brought to bear upon a sister agency.

... Nor does the mere fact that the future commercial development ... was under study ... justify an inference of

wrongful manipulation of the WSSC by either the Council or the Planning Commission.

281 Md. at 21–22, 376 A.2d 505. The court held that the dedication to the public of the property valued at $800,000 did not create any vested rights. 281 Md. at 23, 376 A.2d 505. The court's rationale was that there was no evidence that TKU had been guaranteed a permit to redevelop and that no valid promises by appropriate officials had been made to the developer. The court concluded:

> [I]n order to obtain a vested zoning status, there must be construction on the ground; merely to allege large expenditures without actual construction on the site cannot vest zoning rights.

281 Md. at 23, 376 A.2d 505 (citations omitted). *See also Prince George's County v. Sunrise Dev. Ltd. Partnership,* 330 Md. 297, 623 A.2d 1296 (1993) (finding no vesting where minor construction commenced)[19]; *Board of County Comm'rs v. Pritchard,* 312 Md. 522, 529, 540 A.2d 1139 (1988); *O'Donnell v. Bassler,* 289 Md. 501, 508, 425 A.2d 1003 (1981); *County Council v. Carl M. Freeman Assocs.,* 281 Md. 70, 79–80, 376 A.2d 860 (1977); *Mayor of Baltimore v. Crane,* 277 Md. 198, 206, 352 A.2d 786 (1976); *County Council v. District Land Corp.,* 274 Md. 691, 707, 337 A.2d 712 (1975); *Marathon Builders, Inc. v. Montgomery County Planning Bd.,* 246 Md. 187, 195, 227 A.2d 755 (1967) (holding innocent purchaser contention was without merit where appellant argued it should not be subject to rezoning classification); *Rockville Fuel and Feed Co. v. Gaithersburg,* 266 Md. 117, 125–26, 291 A.2d 672 (1972); *City of Hagerstown v. Long Meadow Shopping Ctr.,* 264 Md. 481, 494–96, 287 A.2d 242 (1972); *Mayor of Baltimore v. Shapiro,* 187 Md. 623, 624, 51 A.2d 273 (1947); *Lipsitz v. Parr,* 164 Md. 222, 228, 164 A. 743 (1933) (holding that even if construction commences but it is based on an illegally issued permit, no vested right is created); *County Comm'rs v. Arundel Corp.,* 82 Md.App. 418, 428, 571 A.2d 1270 (1990), *vacated*

---

**19.** *Sunrise* includes an excellent historical perspective of the Maryland vesting law.

*on other grounds,* 323 Md. 504, 594 A.2d 95 (1991) (stating that application for permit does not create vested right); *Miller v. Forty West Builders, Inc.,* 62 Md.App. 320, 330, 489 A.2d 76 (1985) (holding that vested rights were not acquired by obtaining approval of the subdivision plan); *Prince George's County v. Equitable Trust Co.,* 44 Md.App. 272, 278, 408 A.2d 737 (1979), *cert. denied,* 287 Md. 751 (1980) ("[O]nce construction has proceeded substantially . . . then the owner's right to complete and use the structure is constitutionally protected."); *Millison v. Secretary of Health and Mental Hygiene,* 32 Md.App. 165, 172, 359 A.2d 247, *cert. denied,* 278 Md. 728 (1976) (rejecting contention that party changed his position and purchased tract by relying on the fact that the lots in the subdivision could be sold as lots); *Colwell v. Howard County,* 31 Md.App. 8, 15, 354 A.2d 210, *cert. denied,* 278 Md. 719 (1976) ("[N]o vested right in zoning until . . . 'the shovel is in the ground.'") (quoting *Rockville Fuel,* 266 Md. at 117, 291 A.2d 672).

In *Steuart Petroleum Co. v. Board of County Commissioners,* 276 Md. 435, 347 A.2d 854 (1975), the Court stated the test required to determine commencement of construction as:

> [a] manifest commencement of some work or labor on the ground which everyone can readily see and recognize as the commencement of a building . . . begun with the intention and purpose then formed to continue the work until the completion of the building.

276 Md. at 444, 347 A.2d 854 (quoting *People's Counsel v. Public Serv. Comm'n,* 259 Md. 409, 416, 270 A.2d 105 (1970)). The Court noted that it was "unpersuaded by the argument that the rule is less onerous elsewhere. . . ." 276 Md. at 444, 347 A.2d 854 (quoting *County Council v. District Land Corp.,* 274 Md. 691, 707, 337 A.2d 712 (1975)). *See also Spence v. Zimmerman,* 873 F.2d 256, 258–59 (11th Cir.1989) (holding that owners of partially finished house did not have property interest protected under the Due Process Clauses until they met the minimum safety requirements); *Wincamp Partnership v. Anne Arundel County,* 458 F.Supp. 1009, 1027 (D.Md. 1978) ("A property owner has no vested right in the continu-

ance of the zoning status of his land unless he has proceeded with construction in reliance upon it.").

In the case at bar, appellant was unable to commence actual construction. Thus, his interest in the prior zoning did not vest. The trial court in the case *sub judice* found that the County

> acting in some cases alone and at other times in concert with other agencies ... has taken steps to keep Community X a low density area. That this is their intent ... was freely acknowledged....
>
> ... Furthermore we do not believe that concerted cooperation and action ... to maintain an area, including the property of Appellant in a low density zone,[20] even after they may have earlier led him to believe they would do otherwise, constitutes evidence of an illegal or even an arbitrary and capricious action if the purpose ... serves a legitimate state interest and as in the case *sub judice* the record does not establish any vested rights of Appellant....

Apparently believing that the law of vesting controls in the circumstances of this case, the trial court did not consider the question of zoning estoppel. We agree with the lower court that appellant cannot prevail under vesting principles; however, we choose to address the issue that, at least inferentially, was raised below but which the lower court did not address—whether zoning estoppel may apply in the case *sub judice.*[21]

### B. Zoning Estoppel

We have found no Maryland cases on zoning es-

---

**20.** Appellant's property, in Community X, was commercially-zoned.

**21.** We note that in *Richmond Corp. v. Board of County Commissioners,* 254 Md. 244, 255 A.2d 398 (1969), the Court of Appeals had the opportunity to reject the doctrine of estoppel in zoning cases. Nevertheless, it chose not to express an opinion with respect to that issue. 254 Md. at 262, 255 A.2d 398. Instead, the Court only commented that if the doctrine were applicable, the facts of that case would not raise an estoppel. 254 Md. at 257, 255 A.2d 398. That Court also had the opportunity to reject the concept in *Washington Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 376 A.2d 505 (1977).

toppel [22]; nor has either of the parties directed us to such Maryland authority. It is thus unclear to what extent the doctrine exists or should exist in Maryland. Therefore, we shall examine the law in other jurisdictions to guide us in our decision.[23]

In *Pokoik v. Silsdorf*, 40 N.Y.2d 769, 390 N.Y.S.2d 49, 358 N.E.2d 874 (1976), Pokoik, the property owner, initially applied for a building permit to build an addition to his house. The permit was denied because of a previous violation of the zoning restrictions involving rentals. No appeal was taken from that decision. Subsequently, Pokoik revised his plans for the addition and applied for another permit. The Mayor informed Pokoik that the building inspector would not take action on the permit. A trial court ordered the inspector to act on the application, but the building inspector denied the permit. An appeal was noted to the zoning board of appeals, and the first hearing was postponed due to the failure of the respondents to appear. In the meantime, the village amended its zoning code resulting in a prohibition of Pokoik's proposed addition. Thereafter, the board of appeals held the hearing

22. The Court of Appeals applied equitable estoppel principles in *Permanent Financial Corp. v. Montgomery County*, 308 Md. 239, 518 A.2d 123 (1986), holding that the County was equitably estopped from requiring the removal of the fourth floor when it had been constructed under a permit that had been issued pursuant to the County's prior interpretation of the statute.

23. There is some conflict between the applicability of the respective theories of vesting and estoppel. *See Richmond*, 254 Md. at 260, 255 A.2d 398. *See also Tri–State Generation & Transmission Ass'n v. Board of County Comm'rs*, 42 Colo.App. 479, 600 P.2d 103 (1979); *Cannon v. Clayton County*, 255 Ga. 63, 335 S.E.2d 294 (1985); *County of Kauai v. Pacific Standard Life Ins. Co.*, 65 Haw. 318, 653 P.2d 766 (1982), *appeal dismissed sub nom. Pacific Standard Life Ins. Co. v. Committee to Save Nukolii*, 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983); *Western Land Equities, Inc. v. City of Logon*, 617 P.2d 388 (Utah 1980). We stress that vesting is distinct and separate from zoning estoppel. The doctrine of zoning estoppel prevents the officials from taking particularly egregious actions designed to prevent vesting and then relying on the absence of vesting to thwart the previously permitted plans of the developer.

and denied the building permit based in part on the new zoning ordinance.

The court held that:

> The village used dilatory tactics to discourage petitioner from seeking the building permit to which he was entitled by first refusing to act on his application and, after court proceedings directing it to act, delaying action still further. In addition, when he was finally progressing with his appeal, an amendment was passed which would serve to cut off his rights. "This administrative procrastination, calculated to deny a property owner his right to use this land in a currently lawful manner, is supportable neither by law nor by sound and ethical practice."
>
> . . . The petitioner has demonstrated that he was entitled to the permit as a matter of right . . . and that proper action upon the permit would have given him time to acquire a vested right. . . . The petitioner was denied this right by the unjustifiable actions of the village officials, and by an abuse of administrative procedures.

390 N.Y.S.2d at 392, 358 N.E.2d at 876 (citations omitted).

In *Faymor Development Co. v. Board of Standards and Appeals*, 45 N.Y.2d 560, 410 N.Y.S.2d 798, 383 N.E.2d 100 (1978), the developer had a permit for a six-story building and was prepared to begin construction. Before construction commenced, however, the building department revoked the permit. Faymor appealed, and the board reinstated the permit. Area residents subsequently inundated the area, surrounded it, and denied access to construction crews. Meanwhile, the city did nothing to facilitate access to the construction site. The area residents obtained a temporary injunction stopping the work, but it lapsed when the residents failed to file a bond. Thereafter, actual construction began for one day. The following day the area residents again denied access to the site by surrounding it. Faymor twice obtained court orders against the interference, which were ignored, and he requested the police, traffic, and fire departments to assist him in removing the citizens and their vehicles. His efforts, however,

failed. While these events were occurring, the city rezoned the property to one and two-family homes which effectively prohibited Faymor's project. Again, the building department revoked his building permit based on the new ordinance. The New York Court of Appeals held:

> A court ... may estop the city from asserting the landowner's failure to complete the foundations if ... the city has interrupted construction by illegally suspending the permit. Similarly a court may deny an agency the benefit of a change in the law when it has intentionally or even negligently delayed action on an application for a permit or license until after the law had been amended to authorize denial of the application....
>
> ....
>
> ... Throughout the period city officials displayed a willingness to appease the protesters at petitioner's expense.... Finally, to satisfy the protesters the board ... terminated the permit and the petitioner's rights by zoning out the project.... It [the city] may ... be estopped from claiming the benefits of its own inaction, whether intentional or merely negligent.

410 N.Y.S.2d at 800–01, 383 N.E.2d at 102–03 (citations omitted). *See also Amsterdam–Manhattan Assocs. v. Joy*, 42 N.Y.2d 941, 397 N.Y.S.2d 1000, 1001, 366 N.E.2d 1354, 1355 (1977) ("Even in the absence of bad faith, administrative procrastination ... be it negligent or willful ... affords a basis for applying the pre-existing regulation to the applications."). *Cf. Alscot Investing Corp. v. Incorporated Village of Rockville Centre*, 64 N.Y.2d 921, 488 N.Y.S.2d 629, 477 N.E.2d 1083 (1985) (upholding a change in the zoning code after a temporary moratorium delayed the issuance of a permit).

In *Whitehead Oil Co. v. City of Lincoln*, 234 Neb. 527, 451 N.W.2d 702 (1990), Whitehead Oil purchased property that was zoned for a planned commercial district. It was subsequently rezoned as a neighborhood business district which permitted retail stores, car washes, and service stations. In 1986, the company applied for a land-use permit that would

allow a convenience store, car wash, and gasoline station on the property. The planning director initially recommended denying the proposed use, but after Whitehead Oil modified its plans the director recommended approval of the use. In the meantime, neighboring property owners filed a petition to downzone the subject and other property "in order that no retail activity (including convenience stores) be allowed...." 451 N.W.2d at 704. The planning commission voted to delay action on Whitehead Oil's application pending the request for rezoning. Nevertheless, when the council mandated that the commission forward its recommendation on the application, it did so recommending that the permit be approved because it met the requirements of the existing regulation. The council and the planning director, however, further delayed action on the application "in order 'to allow the change of zone ... to proceed through the Planning Commission.'" 451 N.W.2d at 704. After the council rezoned the property as requested by the neighbors, it then denied Whitehead Oil's application.

Whitehead Oil contended that it had acquired a vested right in the prior zoning because of the filed permit application. The Nebraska Supreme Court rejected this argument, noting that Whitehead Oil had neither commenced construction nor expended a substantial amount of money so as to deprive Lincoln of the right to exercise its police power. 451 N.W.2d at 706. Nevertheless, the court held:

All the same, a zoning authority may not use its powers to reward its friends or punish its enemies; thus, where a zoning authority is guilty of misconduct or bad faith in its dealings with the applicant for a use permit in accordance with the then existing zoning regulation or arbitrarily and unreasonably adopts a new regulation in order to frustrate the applicant's plans for development rather than to promote the general welfare, the new regulation may not be applied retroactively.

451 N.W.2d at 706–07. Because there was a genuine issue as to whether Lincoln acted arbitrarily, unreasonably or in bad faith by delaying the application, the court concluded that Lincoln was not entitled to summary judgment as a matter of

law. 451 N.W.2d at 707. *See Marmah, Inc. v. Town of Greenwich,* 176 Conn. 116, 405 A.2d 63, 67 (1978) (holding it inequitable to allow amended zoning regulations to act as a bar where the trial court could reasonably conclude that the change was enacted primarily to prevent plaintiff from building the project); *Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819, 825 (1976) (recognizing the merit in zoning estoppel but record lacked evidence of arbitrary, capricious, or unreasonable conduct); *PMC Realty Trust v. Town of Derry,* 125 N.H. 126, 480 A.2d 51, 55 (1984) (holding that if the town acted in bad faith in negotiations and litigation which prevented construction, then "the plaintiffs [on remand] cannot be deemed to have lost any rights [to vest] that they would have been able to exercise in the absence of bad faith."); *State ex rel. Humble Oil & Ref. Co. v. Wahner,* 25 Wis.2d 1, 130 N.W.2d 304 (1964) (holding that it would be inequitable to allow a town to deny a permit based on a new ordinance after the property owner was denied a permit three times and brought suit to determine the validity of the prior ordinance). *See also Medical Servs., Inc. v. City of Savage,* 487 N.W.2d 263, 267 (Minn.Ct.App.1992) (holding that a city may not act arbitrarily in adopting a moratorium ordinance in order to prevent a party from obtaining a building permit to delay or prevent a single project, the city "must exercise the authority for the purpose of protecting the planning process.").

## C. RESOLUTION OF THE ESTOPPEL ISSUE

The County's actions in denying a sewer upgrade have already been determined to have been arbitrary and capricious. There was no appeal of that decision. Its lack of compliance with the court's order was also improper. Additionally, its downgrade of sewer availability appears to have been an effort by the County to hinder further the ability of appellant to obtain permits to which he was then entitled.

In arriving at our resolution, we are particularly aware that Maryland has adopted the strict test as to vesting, *i.e.,* actual substantial construction. As we perceive that standard, it appears to be sufficiently rigid to protect the

planning process generally. That rigidity, as we have seen from the cases, can impose heavy burdens on property owners who are unable to progress to actual construction by the date of downzoning even *under a normal application of the zoning process*. We perceive that extra burdens, such as those alleged in the case at bar, imposed on a property specific basis, are discriminatory; when imposed by officials to take further advantage of the already strict vesting rule, they may be arbitrary and capricious. We believe and hold, therefore, that zoning estoppel is applicable in Maryland.

▆▆▆ It is now our task to determine whether, under the alleged circumstances of the present case, a trier of fact could find that the County is estopped from applying the provisions of the new comprehensive rezoning to the subject project.[24] If estopped, the appellant's development project could proceed as if the requirements of the prior zoning would be applicable to the project.

Appellant goes to great lengths to complain of an alleged conspiracy between different governmental entities and un-identified persons. He alleges certain actions taken by the City of Bowie in opposing his project for purposes of stymie-ing competition. These matters are not amply supported in the record now before us, and we shall not address them.

We are most concerned with the County's actions with regard to the 1988 application for a sewer category upgrade, its actions during that litigation, its failure either to appeal the trial court's adverse judgment or to comply with it, and its prior and subsequent conduct. Its conduct in that case and its activities during the project review process, especially consid-ering the attitude of the planning staff,[25] give us grave concern

---

**24.** Were we to find that the facts alleged by appellant, even if believed by the trier of fact could not create an estoppel, we could affirm without the necessity for a remand.

**25.** In the conclusion to the planning staff's 1988 report, the staff clearly displayed its bias against the prior county action in commercially zoning the property. "From staff's perspective, we would prefer this application [to] go away. We were opposed to the rezoning in 1969, we

as to the propriety of what was done in the case *sub judice.* In light of the fact that there was no temporary moratorium applicable to the entire master plan (SMA) area or any substantial portion of it, that there was no other procedure that might be construed as affecting an area-wide slow down or stay pending rezoning, and, that the record reveals only that appellee attempted to stop this project pending rezoning, we have difficulty in perceiving that the County's actions with respect to the sewer downgrade were done to protect the zoning process generally, as opposed to being directed at specific property. Thus, in that respect, its actions might have been discriminatory against the subject property.

In the dispute giving rise to the case at bar, a trial court had previously issued its writ of mandamus finding that the County's refusal in 1988 to issue the sewer upgrade had been arbitrary and capricious. The County did not appeal. Nevertheless, the County refused promptly to issue the permit, apparently cloaking its defiance of the court order by adopting a position that it would reconsider the sewer upgrade at its next regular sewer review. It virtually ignored the trial court's finding that its *previous* action was improper and continued a course of arbitrary and capricious, even potentially contemptuous, actions in regard to that permit. It appears clear to us that the County's purpose in not issuing the upgrade, in delaying and litigating the issue, and then not

---

wanted to downzone it in 1975, and we believe *any use* of the property should wait for completion of the new Master Plan and SMA." (Emphasis added.) It would be hard to find a clearer statement of the arbitrary and capricious attitude of the staff towards this project and the council's past zoning decisions in reference to it. It may well be that the staff believed that its actions were justified from a planning point of view and that they were acting in the public good, but as George Bernard Shaw philosophized: "Hell is paved with good intentions, not with bad ones. All men [and women] mean well." George B. Shaw, *Man and Superman* 226 (1931).

The staff goes on to lament that they "have no control over these matters...." They misconstrue their administrative function. They *advise* those who have the people's conferred power. Beyond that they have no, or in a democracy should they have, control over policy matters.

complying with the court order could have been to stall the issuance of the sewer upgrade so that appellant's property would not qualify for a building permit, thus denying him any opportunity to commence construction and vest his interest in the existing zoning, as he had a right to do.

In denying the sewer permit, Prince George's County was in large part attempting to do again that which was condemned in *Prince George's County v. Carusillo,* 52 Md.App. 44, 447 A.2d 90 (1982). In *Carusillo,* the trial court found that the County Council had been arbitrary and capricious in denying the sewer upgrade requested, and thus it issued a writ of mandamus ordering that the County grant the upgrade. 52 Md.App. at 50, 447 A.2d 90. The County appealed.

In rendering our decision, we opined that there was nothing in the statute that granted "the County any discretion to set up criteria defining each of the six water and sewer areas and then refuse to permit any change when an applicant has met the criteria...." 52 Md.App. at 51, 447 A.2d 90. We then stated that:

> Nothing in Section 387C says the Council or county officials may pick and choose among those who have met the criteria, to grant an upgrade to one and not to the other. Such far-reaching discretion is equivalent to arbitrariness.
>
> . . . .
>
> ... The County is bound by its own criteria and cannot bootstrap its desire to retard or thwart development in a commercially zoned area onto a statute designed to prevent future sewer moratoria.

52 Md.App. at 51–52, 447 A.2d 90 (footnotes omitted). We upheld the issuance of the writ of mandamus.

Simply stated, while under certain circumstances it *may* be appropriate, if properly done, to impose an area-wide temporary moratorium in order to protect the planning process, it is inappropriate to use the process of sewer permits and sewer category upgrades to place properly zoned specific properties in a state of illegal suspension until a master plan and SMA can subsequently be adopted. In the case at bar,

the suspension began in 1988 and extended two years or more. When the property was rezoned to a classification permitting the commercial use in 1969-70, that rezoning, not the subsequent wishes of planners, represented the will of the residents of the county as expressed through the actions of their elected representatives in passing the rezoning. The prior rezoning permitting commercial use is the "law of the land" until it is changed by the elected representatives. We note that if the people, as expressed through the actions of their representatives, want a particular zoning or no zoning at all, that is their choice.

From the facts contained in the record, a strong inference can be made from the County's actions with regard to the sewer category upgrade that it acted arbitrarily and capriciously in refusing to issue a category three permit. The evidence, if believed by the trier of fact, may well support a finding that the County's sole purpose in denying appellant, for a period of three years or more through its denial of a sewer upgrade permit, any opportunity to commence construction permitted by the existing commercial zoning was to consummate a downzoning that would effectively prohibit the use planned by appellant. This appears especially evident, and may be made virtually undebatable, by the appellee's contemptuous actions in neither appealing nor obeying the trial court's order to issue the sewer permit. The record clearly supports an inference that appellee's delay in compliance with that order was not a coincidence; it was a calculation designed to delay appellant until the use became prohibited. The County's need to delay appellant was necessitated by the inherent length of time required to process the (SMA) for the larger geographical area. It would appear that only through the comprehensive rezoning process could the County accomplish a downzoning without the property owner's consent.

We hold, therefore, that especially egregious actions of public officials in stalling the issuance of permits in order to eliminate development by downzoning may create a zoning estoppel as to particular properties. In the case at bar, the

allegations as to appellee's actions in totality, especially in regard to the petition for a writ of mandamus that kept appellant from acquiring a vested right under existing zoning, if believed by the trier of fact, may estop appellee from applying the downzoning to deny the issuance of a building permit for the subject property. As the trial judge relied exclusively on "vesting" theories and did not determine whether the facts supported a zoning estoppel, we shall remand this case to him for a further hearing, if necessary, and for a finding as to whether the facts, many of which he accepted in his opinion, are sufficient to estop the County from denying the issuance of a permit under the zoning as it was in 1988.[26] We note that our holding does not invalidate the comprehensive rezoning.

JUDGMENT UPHOLDING COMPREHENSIVE RE-ZONING AFFIRMED; TRIAL COURT'S JUDGMENT OTHERWISE VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.

---

**26.** Appellant's victory in the case *sub judice* may well be a hollow one. Even if the trial court finds an estoppel, appellant has dismissed or waived any claim for monetary damages. While our decision, and a subsequent favorable finding by the trial court, would enable him to obtain a permit to develop under the previous statute, whatever he develops will be, if it does not comply with the new statute, immediately non-conforming, as our decision does not invalidate the comprehensive rezoning. If he had constructed the center in 1988, it would have become non-conforming upon the 1991 rezoning. Our decision and a subsequent favorable ruling by the trial court would merely place him in that status.